1
2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

3
4

JIM AANA, ET AL., on behalf )   Case No. CV12-00231LEK-BMK
of themselves and all others)
similarly situated,          )
                             )

5
6

          Plaintiffs,        )   Honolulu, Hawaii
                             )   October 24, 2013
          v.                 )   10:59 a.m.
                             )

7
8
9

PIONEER HI-BRED              )
INTERNATIONAL, INC., ET AL.,)
                             )
          Defendants.        )
_____)

10
11
12
13

TRANSCRIPT OF
1) DEFENDANTS' MOTION FOR PROTECTIVE ORDER
2) DEFENDANTS' MOTION FOR PROTECTIVE ORDER PURSUANT TO DOCKET
NO. 330
BEFORE THE HONORABLE BARRY M. KURREN
UNITED STATES MAGISTRATE JUDGE

14

APPEARANCES:

15
16

For the Plaintiffs:          LYNCH HOPER SALZANO & SMITH
                             By: P. KYLE SMITH, ESQ.
                             970 N. Kalaheo, #A301
                             Kailua, Hawaii 96734

17
18
19
20
21

Transcription Service:       Jessica B. Cahill
                             P.O. Box 1652
                             Wailuku, Maui, Hawaii 96793

22
23
24

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

25

1  CONTINUED APPEARANCES:

2  For the Defendants:          CARLSMITH BALL, LLP
                                By: MICHAEL M. PURPURA, ESQ.
3                                   MICHAEL J. SCANLON, ESQ.
                                1001 Bishop Street, #2200
4                               Honolulu, Hawaii 96813

5                               GLYNN AND FINLEY, LLP
                                By: ADAM D. FRIEDENBERG, ESQ.
6                               100 Pringle Avenue, #500
                                Walnut Creek, California 94596
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   OCTOBER 24, 2013                               10:59 A.M.

2          THE CLERK:  The United States District Court for the

3   District of Hawaii with Honorable Barry M. Kurren, United

4   States Magistrate Judge presiding is now convened.

5          Case CV12-231LEK-BMK, Jim Aana, et al. v. Pioneer

6   Hi-Bred International.  Motion for -- hearing on defendants'

7   motion for protective orders.  Please make your appearances.

8          MR. SMITH:  Good morning, Your Honor, Kyle Smith on

9   behalf of the plaintiffs.

10          THE COURT:  Good morning.

11          MR. FRIEDENBERG:  Good morning, Your Honor, Adam

12   Friedenberg for the defendants.

13          THE COURT:  Good morning.

14          MR. PURPURA:  Good morning, Your Honor, Michael

15   Purpura for defendants.

16          THE COURT:  Good morning.

17          MR. SCANLON:  Good morning, Michael Scanlon for

18   defendants.

19          THE COURT:  Good morning.  So, you not only have

20   killed every forest in the city, you also want to show a

21   video in connection with the motions here today.

22          MR. FRIEDENBERG:  It will be only a little bit of

23   video, Your Honor, mostly aesthetic slides, but I did think

24   because we've given the Court so many trees that it might be

25   helpful to condense to the extent we can, and then highlight

 1  a few important concepts.

 2          THE COURT:  It's been a long time since I've spent

 3  hours reading material in connection with a discovery motion,

 4  but that's -- that's what we had to do in connection with

 5  this.

 6          Anyway, I do think we can get through this fairly

 7  quickly.  Now, I have read everything carefully.  Of course,

 8  I'm very familiar with the case.  I would like to start out

 9  on the inspection.

10          And, Mr. Smith, I have a question that I wanted to

11  ask you in connection with that to start with.

12          MR. SMITH:  Sure.

13          THE COURT:  And that is why do you feel you need to

14  take soil samples?  What would be the purpose for that?

15          MR. SMITH:  There's a couple different reasons.  So,

16  one reason to take the soil samples is because when you take

17  a sample you can then -- and I'm not the scientist doing

18  this -- but essentially you can then do a -- I think it's

19  called aspeciation -- or basically determines what the -- how

20  dried out the soil is, what's the particle size, how

21  destroyed, if it's clumped, this kind of thing.

22          And what that basically helps you do is then

23  determine how likely that soil is going to get picked up by

24  the wind.  Now, that's reason one.  Essentially, what it does

25  is -- the way I understand it is they dry it out, and then

1   they say, look, within this silty soil, volcanic soil, you

2   have extremely fine silt, you have clays, you have this.

3   These silts are specifically very susceptible to wind

4   erosion.  Now, that's reason one.

5          The other reason that we would like to do soil

6   sampling too -- and this is alleged in the complaint -- is

7   that because of the long-term use of organic arsenical

8   pesticides, these are things like -- particularly sugar cane,

9   there's a large scale of contamination of former sugar cane

10  fields on Kauai, Oahu, everywhere else with higher levels of

11  arsenic quality.

12         So -- you can see it, in fact, around golf courses,

13  because they use the same kinds of pesticides.  So these

14  pesticides, when they're sprayed, they then degrade into the

15  environment into arsenic in the soil.

16         So if you're going to go out there and plow 1,000

17  acres, right, over and over again, over and over again, and

18  it's picking up soil, that's not good from the standpoint of

19  the impact on the property.

20         THE COURT:  Yeah, but, you know, this is a case in

21  which you are seeking relief, you know, for property damage,

22  not for personal injury or for health issues, and the like.

23  So I don't see how that would be relevant to any of the

24  issues that are actually involved in this case.

25         MR. SMITH:  Well, here's the reason.  Is that if

1  you're contaminating Waimea just with dust there's a property

2  impact, right?  If you're contaminating Waimea with arsenic

3  leadened dust, then it's a much more severe concern for the

4  community.  That's why we want to know.

5           THE COURT:  Well, you know, that may be --

6           MR. SMITH:  Correct.

7           THE COURT:  -- but, you know, maybe you should go to

8  the EPA --

9           MR. SMITH:  Sure.

10           THE COURT:  -- and have them conduct testing for

11  that purpose.  I can certainly understand the concern of the

12  community, but that's not what this lawsuit is really all

13  about.

14           MR. SMITH:  Sure.

15           THE COURT:  Okay.  Well, this is really the first

16  that I've heard of the first purpose --

17           MR. SMITH:  Right.

18           THE COURT:  -- in determining how dry this soil

19  is --

20           MR. SMITH: That's right.

21           THE COURT:  -- so that you can -- it supports the --

22  the argument about how freely it might travel to your

23  clients' homes, right?

24           MR. SMITH:  Yes.  Well --

25           THE COURT:  Okay.  So why should they not be able to

1 do that?

2       MR. FRIEDENBERG:  Well, as Your Honor noted this is

3 the first, essentially, that we're hearing of it.  There has

4 been no expert declaration to establish the threshold

5 proposition that this is plausible or that it is something

6 for which sampling of this particular soil is necessary.

7 There's been no threshold showing that there is some reason

8 to conclude that the soil --

9       THE COURT:  Well, do you need to do that in order to

10 conduct an inspection?  I mean that's a chicken and the egg.

11 I mean if that's part of their theory -- well, actually it's

12 a good point.  Do you have an expert that's working with you

13 on this particular subject on this point?

14       MR. SMITH:  We do.

15       THE COURT:  Okay.  And this expert has indicated

16 that he or she needs that type of evidence in connection with

17 supporting the opinions.

18       MR. SMITH:  Sir, it was their idea as far as the

19 soil testing part.

20       THE COURT:  Right.

21       MR. SMITH:  Now, look I -- could we get around -- I

22 mean, look if you tell us not to do it we're going to make

23 do, right.  But from the standpoint of being able to know

24 what those soil characteristics are up on the plateau, you

25 can then say when this soil moves into the air, you're going

1  to have very find levels of dust below, whatever --

2          THE COURT:  Okay.

3          MR. SMITH:  -- that kind of thing.  So that's --

4          THE COURT:  I'm sorry, I didn't mean to cut you off,

5  but go ahead.

6          MR. FRIEDENBERG:  No --

7          THE COURT:  Go ahead.  You can finish on this point.

8          MR. FRIEDENBERG:  -- well, yeah, and just to respond

9  further to Your Honor's question about why the first point

10  doesn't justify the soil sampling, the issue in this case is

11  not what kind of soil we're dealing with, but whether the

12  soil is being transported by wind from Pioneer's property to

13  the plaintiffs' property.  And, if so, whether Pioneer has

14  adopted or has taken steps -- reasonable steps to mitigate

15  those impacts and to mitigate that circumstance.

16          And so, looking at the dirt on Pioneer's property

17  doesn't tell you anything at all about that.

18          THE COURT:  Well, you know, I suppose here --

19  actually, I came into Court on this particular point thinking

20  I would not allow this aspect of the inspection, but as I've

21  heard, you know, Mr. Smith, articulate this and in thinking

22  about the points that you're just discussing, you know, it

23  seems to me that if -- there is a question about how

24  reasonable the -- you know, your clients efforts were to

25  mitigate against this dust from -- you know, from spraying or

1  traveling to the adjacent property.

2       If the work in connection with these fields is

3  creating a type of soil that is so dry that it more easily

4  does become a problem here, you know, might that bear on that

5  issue?  And I'm just sort of talking out loud about this now.

6       MR. FRIEDENBERG:  Yeah, what I would say, Your

7  Honor, is that absent some threshold showing that that is a

8  theoretical possibility, then the claim of relevance is

9  entirely conjectural and entirely speculative, and we've --

10 as Your Honor has pointed out, we have put on your plate a

11 lot of paper in connection with these motions and what has

12 been completely -- what is completely absent from all that

13 paperwork is any substantiation to that sort of a theory.

14      And so, unless you have an expert who can say the

15 composition of the soil or the nature of the soil is relevant

16 to whether that soil is being transported by wind from point

17 A to point B, then there hasn't been any showing to justify

18 the relevance of the discovery or that it's likely to lead to

19 the discovery of admissible evidence.

20      THE COURT:  Okay.  Okay.

21      MR. FRIEDENBERG:  And that's the record that we have

22 before us.

23      THE COURT:  Okay.  I understand your point.  So is

24 there anything else you want to talk about specifically on

25 the inspections.  I've read everything that you've -- you

1 know, you've identified.  So you don't need to go through it

2 all, but if there's something in particular that you want

3 point out here today that you feel needs to be elaborated on

4 or discussed.

5         MR. FRIEDENBERG:  Sure.  Maybe what I'll do at this

6 point is go through the presentation we brought for Your

7 Honor --

8         THE COURT:  Okay.  You know --

9         MR. FRIEDENBERG:  -- and I'll go through it quickly.

10        THE COURT:  -- okay.

11        MR. FRIEDENBERG:  -- or if you would prefer to go --

12        THE COURT:  Well, you don't need to go through the

13 whole dog and pony show, if that's what you want to do,

14 because I mean I'm well familiar with the issues that you've

15 raised and that have been countered and discussed.

16        And so --

17        MR. FRIEDENBERG:  Okay.

18        THE COURT:  -- I mean I sort of have in mind what I

19 want to do here on this, but I mean if there's something that

20 you feel that you haven't been able to explain well enough or

21 identify clearly enough -- I mean you most definitely have

22 made a record, and, Mr. Smith, you've made a record.

23        So I mean, you know, you've got a record, but, you

24 know, I'm happy to hear or see whatever you want to show, but

25 I just don't need you to go through it all.

 1          MR. FRIEDENBERG:  Okay.  Well, I don't want to waste

 2   any more of your -- or any of Your Honor's time, so on the

 3   sampling I would just point out, and I think Your Honor is

 4   already there, but the notion that the chemicals -- or that

 5   if there are chemicals present in the soil that is somehow

 6   relevant in this case is completely wrong.

 7          There is no personal injury claim, there is no claim

 8   for increased likelihood of injury, which would be a personal

 9   injury claim, and there's --

10          THE COURT:  Right.

11          MR. FRIEDENBERG:  -- the notion that you're anxious

12   about the possibility that you might be exposed to something

13   that could cause a personal injury is not something that's

14   actionable either in Hawaii or on the claims that are

15   alleged.

16          THE COURT:  Okay.  I agree with that point.

17          MR. FRIEDENBERG:  Okay.

18          THE COURT:  Okay.  Mr. Smith.

19          MR. SMITH:  Could -- I just want to respond to that

20   very brief point.  So -- and maybe just explain that -- the

21   way that we conceptualize it.

22          So if I have a client, and she's in her home, and

23   she's upset about dust, and she's smelling odors, and she's

24   worried that she's being -- her, her grandkids, and her

25   family is being exposed to pesticides, right, and she says

1  this has really impacted my use and enjoyment of the

2  property.  All right.  She can do that.  And we know now

3  that -- what pesticides they're spraying, and we can do

4  models and other things to show how those pesticides would

5  get down into the town.

6          Well, what the jury's going to want to know though,

7  and this impacts whether or not that claim for her fear is

8  really valid or valuable, I should say, is they're going to

9  want to know is that a rational fear.  Is this just some

10  frankly --

11          THE COURT:  There's no such claim in this case for

12  that though.

13          MR. SMITH:  -- for use and enjoyment of property,

14  sure there is.  So we showed that that's a reasonable,

15  rational fear for our people.  It's not just we're making

16  stuff up.  They really are smelling stuff.  This carries real

17  risks, and their fear for their family, for their health, is

18  real.  That's the distinction.  That's why we think it's

19  relevant.

20          We're not arguing.  We're not arguing that --

21          THE COURT:  So you are seeking damages for emotional

22  distress.

23          MR. SMITH:  Well, certainly for use and enjoyment of

24  your property.  It impacts how much this has taken away from

25  your ability to go have a hibachi with your grandkids.

1  You're not going outside, because you're worried about your

2  exposing them to pesticides.

3        The jury's going to say, well, there's no evidence

4  in this case to show how dangerous these pesticides even are

5  or what you're being exposed to.  That's what we're afraid

6  of.

7        So we can show now -- what we're endeavoring to show

8  is these pesticides do come into the community.  They do

9  carry severe health threats.  That's why the health risks are

10  relevant.

11        THE COURT:  Well -- but he knows what the pesticides

12  are that are being used on the fields; doesn't he?

13        MR. SMITH:  Yes.

14        MR. FRIEDENBERG:  He most certainly does, Your

15  Honor.

16        MR. SMITH:  Yes, we do.

17        MR. FRIEDENBERG:  We've produced extensive

18  information on that.

19        THE COURT:  Right.

20        MR. SMITH:  Right.

21        THE COURT:  So, I mean, you have that information.

22        MR. SMITH:  You're right.  We do.  We do.  And as

23  far as it relates specifically to testing on the fields, to

24  draw back to the original point, the reason we thought that

25  was relevant is this history of arsenic contamination --

1          THE COURT:  Uh-huh.

2          MR. SMITH:  -- I'll tell you this history of damage

3   from sugar cane agriculture was raised by defendants very

4   early on in mediation that there was historic damage to the

5   soil structure from sugar cane fields.  That's the first

6   piece of the testimony.  It's also well known that there's

7   arsenic contamination.

8          So if I'm Pioneer, you know, a very sophisticated

9   farmer that comes into the community, and we say, okay, we've

10  got fields and in the history of arsenic contamination we

11  have historic soil structure damage, what kind of steps are

12  we going to take to protect the Waimea River, to protect the

13  Waimea community?

14         That's why we see it being relevant, but obviously,

15  you know -- and frankly, if we do soil sampling for -- we

16  don't need very many.  We would do a few -- I don't know,

17  maybe three sites.  It's basically just a bucket of soil, and

18  you wrap it up.  You can test that piece for arsenic once

19  it's in our possession.  You don't have to run around and do

20  a bunch of different places.  It's not very -- it's not as

21  onerous as it's been made to sound, I guess.

22         THE COURT:  Yeah.  Well, I mean that's not -- I mean

23  that's not -- I meant that's not really the problem, I

24  think --

25         MR. SMITH:  Right.  I understand.

```
 1              THE COURT:  -- you know, here anyways.

 2              MR. SMITH:  I do.

 3              THE COURT:  Okay.

 4              MR. SMITH:  And I just want to make sure the Court

 5   understands our rational for why we think that's --

 6              THE COURT:  Okay.

 7              MR. SMITH:  -- why that's relevant.

 8              THE COURT:  Okay.  Okay.

 9              MR. SMITH:  Thank you, Your Honor.

10              THE COURT:  Is there anything else you wanted to

11   talk about on the inspection side or are you --

12              MR. SMITH:  The other big issue is just the

13   pesticide storage.

14              THE COURT:  Right.

15              MR. SMITH:  If you keep us from going and taking

16   pictures of that, I'm not going to lose a whole lot of sleep,

17   but on the other hand, the fact that when we did the OIP

18   request and there are past violations of not keeping correct

19   pesticide records --

20              THE COURT:  Right.

21              MR. SMITH:  -- and this kind of stuff, for me I

22   would love to have pictures of where they keep their

23   pesticide storage.  I would love to have pictures of their --

24   for example, in another case we have a pesticide sprayer, and

25   one of the sprayers is supposed to be pointing back or kind
```

1  of like that, and they have spray nozzles pointing straight

2  up, so when they spray it blows it up in the air.  That's why

3  we want to get those pictures.

4     THE COURT:  Did you ask for any photographs, by the

5  way, of any the applicators -- pesticide applicators?

6     MR. SMITH:  The people or the actual --

7     THE COURT:  No, the machinery used to actually apply

8  the pesticides, did you ask for it?

9     MR. SMITH:  I don't -- to be honest with you, Your

10  Honor, I don't know.  Maybe we didn't.  I'm not sure, Your

11  Honor.

12     THE COURT:  I mean you asked for everything else

13  under the sun.

14     MR. SMITH:  We tried.

15     THE COURT:  And you missed that one.

16     MR. SMITH:  Yeah, maybe.  I don't think so.  I think

17  we -- I'm not sure, Your Honor.

18     THE COURT:  Okay.  Okay.  Anything else you wanted

19  to say?  And I'm ready to, you know, rule pretty soon on the

20  objections.

21     MR. FRIEDENBERG:  Let me just briefly, Your Honor.

22  Mr. Smith does not represent the Waimea River, and he does

23  not represent the Waimea community.  What he represents are a

24  number of individual property owners who are claiming

25  interference with their property.

1           And what plaintiffs are doing is a very -- in a very

2    artful way, trying to conflate that concept and that cause of

3    action with a claim for fear of health risks.  The latter

4    claim does not exist under Hawaii law, and even if it did,

5    the plaintiffs themselves have said, unambiguously, in each

6    of the six or seven complaints they filed in these cases, and

7    I want to get the quote accurately, but they have said in the

8    Footnote 37, in their most recent pleading that they

9    disclaim -- I'm sorry, "This complaint does not allege

10   individual personal injuries on behalf of Waimea residents"

11   period.  They have disclaimed personal injury.  The

12   caption -- or rather the complaint is captioned as for

13   property related claims.

14          Now, certainly, if someone is using their property

15   less, or using it differently, or having it interfered with,

16   because they are smelling things, or because dust is being

17   transported from Pioneer's operations to their property, then

18   that is in theory a cognizable nuisance claim.  But that has

19   nothing to do with this idea that the chemicals are

20   dangerous, because they're not making a claim for emotional

21   distress, and they're not making a claim for personal injury.

22        THE COURT:  Right.  Okay.  Let me just ask you one

23   question.  I did want to raise one issue.  On the actual

24   machinery that is used to apply the pesticides, why should

25   they not have an opportunity to see what was actually used?

1          MR. FRIEDENBERG:  Well, because again it's not

2    relevant to any disputed fact in the litigation.  The

3    question is whether these pesticides are being transported

4    from -- one, whether they're coming from Pioneer's premises

5    to the plaintiff's premises; and, two, whether that's

6    creating any interference with the plaintiff's use of their

7    property.

8          This concept that we're afraid of pesticides and

9    that's what we're suing for is not a concept recognized by

10   the law, and it's not one that they're alleging, so --

11         THE COURT:  Yeah, but you maintain in defense that

12   you do this in a customary, and acceptable, and appropriate

13   industry type of manner, so that that protects you.

14         MR. FRIEDENBERG:  Sure, Your Honor, and if they want

15   to ask what type of equipment that we -- that Pioneer uses in

16   its operations, they can, and they have.

17         THE COURT:  Okay.

18         MR. FRIEDENBERG:  And so, they have that information

19   already.  Going into a warehouse and -- or a storage room and

20   taking a bunch of photographs of parked equipment and barrels

21   of chemical don't tell you anything that's relevant to any

22   disputed fact in this case.

23         THE COURT:  Okay.

24         MR. FRIEDENBERG:  It's all about taking pictures for

25   use in connection with political activism.  It's about laying

1  the groundwork for future cases that the plaintiffs' lawyers

2  might like to bring, but it has nothing to do with whether

3  dust is causing people to buy new drapes and repaint their

4  houses.

5          THE COURT:  Okay.  I'm ready to rule on the

6  inspection side of this.

7          So as I mentioned at the outside, because this is a

8  case in which the plaintiffs' seek relief for property

9  damage, I think much of what they want to do here really goes

10 well beyond that.  So I do think some limitations are

11 appropriate as far as the inspection's concerned.

12         First of all, there is no question that they have a

13 right to inspect the property.  To all of the mitigation

14 efforts, the wind protective devices, and the like that have

15 been identified they have a right to -- you know, to look at

16 that, to inspect the fields, to see where they are in

17 relation to where their clients live, and I don't think that

18 really is in dispute here.

19         I do not think there is any relevance -- any reason,

20 for purposes of the discovery in connection with the issues

21 in this case, to inspect the storage facilities, and for the

22 reasons that have been identified.

23         On the soil sampling, I'm going to say no for now,

24 but if there's an expert that would provide an appropriate

25 basis for permitting that down the road, you know, we can

1   talk about it, but at this point I think the argument is well

2   taken that the composition of the soil -- it really hasn't

3   been shown that the composition of the soil really has any

4   relevance for purposes of the property damage claims here.

5   So I'm not permitting that.

6          I am going to permit the inspection of the machinery

7   that is used to apply the pesticides.  I do think there is an

8   appropriate connection to the manner in which, you know, the

9   pesticides are applied that would relate to the

10  transportation of the pesticides to the adjacent property.

11  So I will permit that.

12         And I do think they're entitled to photographs, one

13  way or another, whether you provide them or whether they take

14  them, of the machinery to be used in this case -- for

15  purposes of this case.  Okay.

16         Now, you don't need all day for this inspection.

17  You don't need to bring the world to the fields.  So, you

18  know, if I were to say, you know, the time that you will

19  have, you know, that would be as arbitrary as just picking

20  something out of the sky.  I mean I know actually far less

21  than you folks know about, you know, the work and the layout

22  of the fields and everything else here.

23         So it certainly strikes me that, you know, maybe

24  about half of that time would probably be sufficient, but I'm

25  not going to set any specific time frame now unless you can't

1  agree after you further confer about this.

2        And, you know, certainly you and Mr. Jervis, I guess

3  that's who you -- as far as attorneys are concerned that you

4  want to go out there, I don't really have a problem with

5  that, you know, with a consultant who is working with you on

6  this, it seems appropriate --

7        MR. SMITH:  Right.

8        THE COURT:  -- and maybe some assistant.  That

9  strikes me as probably what you need here.

10        MR. SMITH:  I agree.

11        THE COURT:  Okay.  So you work with the other side

12  on this and work out an appropriate inspection.

13        Have I covered everything that's relevant here as

14  far the inspection is concerned?

15        MR. SMITH:  Yes.

16        MR. FRIEDENBERG:  I believe you have, Your Honor.

17        THE COURT:  Okay.  Okay.  Good.  So on the other

18  side of things on the motion.  You know, I guess, Mr. Smith,

19  one thing I would say, I don't think it's really fair to

20  compare, you know, your discovery versus their discovery as

21  far as depositions are concerned.

22        I mean, you know, you've got hundreds of plaintiffs

23  here who've got -- each of them has their own individual

24  claim.  In fact, you know, it was you at the outset that

25  suggested to them to take 100 depositions or whatever it was,

1  the better way to get the discovery.

2         So I mean it doesn't have to be equal, you know, to

3  be fair about things here.  Now, I don't certainly mean to

4  cut you off at the pass, but to say since they've taken, you

5  know a ton of depositions, I should take a ton of

6  depositions.  That -- you know, that's not the way we do

7  things here.

8         MR. SMITH:  Your Honor, they have never said that

9  and, more importantly, we've never done that.  So -- not what

10  you're saying as far as -- we have no intention to do 5,000

11  deposition -- or interrogatories.  We have no intention to do

12  100 or 50 depositions of everybody.  What --

13         THE COURT:  Okay.  Well, I've looked at your brief

14  here and, you know, it certainly appears reasonable to take

15  the deposition of Charles Okamoto, Bruce Robinson, this Rich

16  Meyers, Russell Burnett.

17         I don't see where you need to take additional

18  depositions with regard to lease negotiations, however.

19  Haven't you got enough information on that?

20         MR. SMITH:  Well, if the witnesses who have

21  produced, namely Mark Takemoto, have actually had any

22  knowledge in lease negotiations, then we might have, but the

23  fact of the matter is, with the exception of Charlie Okamoto,

24  who I've only deposed as a 30(b)(6) on the initial

25  disclosures, I don't think we've deposed anyone that has

1  substantial lease negotiation experience.

2          And the reason is, and it's alleged, and I'll

3  reference the evidence, in some of these lease negotiations

4  dust, and dust complaints, and Waimea community complaints

5  were specific.  And so, it -- the reason we want to do it is

6  because this whole issue -- we obviously think the Robinson

7  entities should be in the case.

8          THE COURT:  Yeah, and, you know, actually while

9  we're on that point --

10          MR. SMITH:  Yeah.

11          THE COURT:  -- there is another motion to dismiss

12  that's teed up on this --

13          MR. SMITH:  That's true.

14          THE COURT:  -- that's going to be heard soon.  I

15  think we ought to hold off on the Robinson related discovery

16  until that motion is heard.

17          MR. SMITH:  Is that for and against our clients?  I

18  meant that's the problem when it happened before, is there's

19  a motion to compel brought, there's a motion to dismiss teed

20  up.  In fact, Judge Kobayashi had even indicated her -- what

21  were her inclinations and that she was going to dismiss them,

22  and Robinson said, no, we want to go forward with all this

23  discovery against you guys.

24          And so, an order on the motion to compel was

25  awarded.  And so, it's -- I understand what you're saying.

1  We're not entitled to do all the same number of depositions.

2  It's different issues, but from our standpoint we're dealing

3  with 15 years, three companies, a lot of different -- a large

4  time frame, and that's why we think more than ten is

5  justified.  We're not arguing --

6          THE COURT:  No, and I don't have a problem with

7  that.

8          MR. SMITH:  -- right.  Now, as to the motion to

9  dismiss, right now we're under a motion to compel that we've

10  been trying to respond to Robinson discovery.  And so, that's

11  part of the fairness issue.  It's like, so Robinsons are

12  going forward with discovery against us, but we can't -- why

13  are they not responding to our discovery.

14          THE COURT:  What's that all about?

15          MR. FRIEDENBERG:  Let me respond to that, Your

16  Honor, and then there are a couple of other points I'd like

17  to respond to with Your Honor's permission.

18          We served -- now, what Mr. Smith is arguing now is

19  something that Your Honor has already decided long ago, the

20  time to appeal it ran long ago.  This is just trying to

21  relitigate old issues that didn't make sense before and make

22  even less sense now given Your Honor's rulings.

23          There has been no discovery by the Robinson

24  defendants that is in some way specific to the Robinson

25  defendants.  The defendants collectively served discovery to

1  each of the plaintiffs, the requests were identical to each

2  of the plaintiffs, and they asked about the things we've

3  talked about with Your Honor at many hearings before now that

4  we've required many hearings with Your Honor to get, and this

5  is basic information about what they're claiming and what

6  their damages are, and so on.

7          So it may be that given that the numerical

8  requirements of the Federal Rules apply to individual

9  parties, it might have been that the Robinson defendants were

10 the propounding party on some of the requests and Pioneer was

11 the propounding party on some others --

12          THE COURT:  Okay.

13          MR. FRIEDENBERG:  -- but it's all discovery to the

14 plaintiffs about the plaintiffs' claims.

15          THE COURT:  Okay.

16          MR. FRIEDENBERG:  Now, I want to get back to --

17 well, it sounds like what Your Honor is contemplating is that

18 we stay all the discovery to the Robinson defendants --

19          THE COURT:  Right.

20          MR. FRIEDENBERG:  -- pending Judge Kobayashi's --

21          THE COURT:  Because you're challenging the new

22 complaint on a motion to dismiss --

23          MR. FRIEDENBERG:  -- that would be dispositive --

24          THE COURT:  -- on the basis of the pleadings and

25 there -- you know, it's a lot they want to do with respect to

1  that, and rather than really get into the weeds on that, I

2  think that motion, you know, ought to be heard and resolved.

3          MR. FRIEDENBERG:  -- and -- yes.  That's exactly

4  what we're saying.

5          THE COURT:  Okay.  And that's what I'm going to do

6  on that, Mr. Smith, okay.

7          MR. SMITH:  I --

8          THE COURT:  And I don't see this -- you know, now I

9  have a better understanding, and it's just the discovery that

10  all the defendants, as a group, you know, presented to you.

11  It wasn't anything specific to the Robinsons, right?

12          MR. SMITH:  Well, what happened is we objected to --

13  and it's not -- okay.  So, first, on the important issue, if

14  that's your ruling we can live with that.

15          THE COURT:  Okay.

16          MR. SMITH:  Let's punt it, because it is a motion to

17  dismiss, it's on the pleadings, I can live with that.  Okay.

18  So that's not at an issue.

19          As far as the specific question is that the

20  discovery was served against us, it's not identical discovery

21  to every claimant.  It's broken up in lots of different sets,

22  so that there's a set for a husband, there's a set for a

23  wife, a set for a renter.

24          We objected to the number of interrogatories as

25  above and beyond -- Pioneer, for example, gets 25, and they

1  said, no, it's 25 from Pioneer, 25 from the Robinsons, 25

2  from --

3       THE COURT:  Oh.

4       MR. SMITH:  -- that's what we get, you know.  And

5  so, that was their position that every defendant gets the

6  full amount, and then they served close to that amount.

7       And so, we didn't turn around and serve discovery

8  from every single one of our claimants --

9       THE COURT:  Right.

10       MR. SMITH:  -- we've got about 50, 60 for the

11  Robinsons.  It's about the same -- it's basically the same

12  set against each of the defendants.

13       So -- but I can live -- the important thing is that

14  your actual issue is to delay it until after the outcome of

15  Judge Kobayashi.

16       THE COURT:  Right.

17       MR. SMITH:  I can live with that.

18       THE COURT:  Okay.  Okay.  So other than the

19  depositions that I've identified are there any other

20  depositions that you're intending -- that you feel you need

21  to have, you know, at this point?

22       MR. SMITH:  The -- well, the 30(b)(6) of Pioneer to

23  have someone answer for them is very important.

24       THE COURT:  Okay.  What about that?

25       MR. FRIEDENBERG:  Well, they've already taken a

1   30(b)(6) deposition --

2         MR. SMITH:  No.

3         MR. FRIEDENBERG:  -- of Pioneer and the rules say

4   that that 30(b)(6) notice is a notice to depose a party.

5   They have deposed the party.  The fact that the party is a

6   corporation doesn't mean you get to go back to the well over,

7   and over, an over again.

8         And I do want to point out that even though we are

9   tabling for now the discovery of the Robinson defendants, I

10  want to correct something that Mr. Smith represented to you

11  that was incorrect.

12        He said that he's deposed Mr. Okamoto, but only as a

13  30(b)(6) witness.  Well, this goes back a ways, because Mr.

14  Okamoto, I believe, was either the first or second deposition

15  in the case.  But at that deposition, Mr. Smith started to go

16  far beyond the 30(b)(6) categories.  I objected.  It

17  continued.

18        At one point, I instructed the witness not to

19  answer, and Your Honor intervened.  And what Your Honor said,

20  at that time, was that a 30(b)(6) deposition notice is not

21  limited to the 30(b)(6) categories.  And so, you allowed Mr.

22  Smith to take a broad deposition of Mr. Okamoto.

23        So the idea that a 30(b) -- that a deposition,

24  because he was produced pursuant to the 30(b)(6) notice is

25  only a narrow 30(b)(6) deposition is simply false, and it's

1  at odds with Mr. Smith's position and with Your Honor's

2  ruling.

3       Now, on the Pioneer depositions that you've

4  mentioned, Mr. Meyers and Mr. Burnett, what I would argue is

5  that there has been no showing of the particularized need of

6  the specific facts that these --

7       THE COURT:  He's given enough information here, if

8  that's correct, to take those depositions.

9       MR. FRIEDENBERG:  Well, what I would argue is that

10 all he has given you is information that suggests that these

11 people are now -- may be knowledgeable regarding subjects

12 that -- on which other witnesses already have been deposed,

13 and I would submit that the Finazzo case that Judge Kobayashi

14 decided --

15      THE COURT:  Right.

16      MR. FRIEDENBERG:  -- and some others we've cited to

17 Your Honor --

18      THE COURT:  Right.

19      MR. FRIEDENBERG:  -- say that once you're beyond the

20 10 that's not good enough.  What you have to show is why a

21 witnesses 11, 12, 13, and 14, have some different knowledge

22 or some superior knowledge, or some knowledge that wasn't

23 attainable from witnesses 1 to 10, and isn't attainable from

24 some other less burdensome and intrusive means.  And on

25 that --

1          THE COURT:  Yeah, but this is not a case where we're

2     strictly following, you know, 10 on each side.

3          MR. FRIEDENBERG:  Well, let me respond to that, Your

4     Honor, and I take your point, and I also take the point made

5     at the outset, which is that to try to make an equivalence

6     between --

7          THE COURT:  Right.

8          MR. FRIEDENBERG:  -- our -- the number of

9     depositions we're taking and the number of the depositions

10    the plaintiffs are taking --

11         THE COURT:  Right.

12         MR. FRIEDENBERG:  -- is completely false.

13         THE COURT:  Right.

14         MR. FRIEDENBERG:  But I want to push back a little

15    bit on this notion that's coming from the plaintiffs or

16    that's being created by the plaintiffs that this is in some

17    way an exceedingly complex case or a massive case that

18    requires --

19         THE COURT:  I know it's not complex.

20         MR. FRIEDENBERG:  -- it's not.  It's a case by one

21    plaintiff against one defendant saying that you caused me a

22    few thousand dollars or in some cases even less damage as a

23    result of dust.  And if this were one case, by one plaintiff

24    against one defendant, there would be no question that the 10

25    deposition rule should be respected.

1          The only reason why the case looks bigger from a

2    case management perspective, is because all these plaintiffs

3    hired the same lawyer, and banded together, and filed one

4    suit, but if we were in 200 different courtrooms or in 200

5    different matters, with each -- by one plaintiff against one

6    defendant, I think you would be hard pressed to conclude that

7    it was a case that required such broad, and expansive, and

8    such a large number of depositions in discovery.

9          So that's the reason why or that's a fundamental

10   reason why I would say that even these two depositions that

11   Your Honor is focused on have not been sufficiently -- the

12   need hasn't been sufficiently proved.

13         THE COURT:  Okay.  Well, I disagree on that, and I'm

14   going to let him do Meyers and Burnett, but you've already

15   deposed Okamoto in the manner that Mr. Friedenberg just

16   indicated?

17         MR. SMITH:  I don't disagree with parts of what he

18   said.  What happened was there was an initial disclosure made

19   of five or six types of categories of documents for all

20   defendants.  We objected, and we said this needs to be more

21   specific under the rules.  They refused.

22         So then we noticed up a 30(b)(6) deposition limited

23   to the initial disclosures for each of the defendants, so

24   that we could figure out what kinds of things were out there

25   before we went and did a bunch of discovery.  Okay.

1  So I noticed up the 30(b) deposition.  I get in with

2  Mr. Okamoto.  I have to go somewhat beyond that.  I can't

3  just say, well, what documents do you have.  I have to say,

4  well, were you involved in this, do you have documents of

5  that kind, were you involved in this, do you have documents,

6  do you have e-mails, do you have this, and Mr. Friedenberg

7  started to object to the scope.  You're going way beyond the

8  scope of 30(b)(6), and then instructed his client not to

9  respond.

10  That's when we called Your Honor, and you said you

11  can go beyond the scope of just this narrow scope.

12  THE COURT:  Okay.

13  MR. SMITH:  And we made clear on that record, for

14  sure -- and I won't --

15  THE COURT:  And you did that.

16  MR. SMITH:  -- and I did that, but it was clear on

17  the record that I wasn't conducting a full deposition of Mr.

18  Okamoto, and it was clear -- and I don't have the transcript

19  in front of Your Honor, but look I'm not going to go back and

20  ask these same kinds of questions of Mr. Okamoto again.

21  And, consequently, I didn't ask him about all kinds

22  of stuff.  We tried to limit it to the kinds of documents --

23  THE COURT:  Okay.

24  MR. SMITH:  -- they had available.

25  THE COURT:  Okay.  I'll let you finish up with Mr.

1  Okamoto.  I'm going to let him do -- finish up with Okamoto,

2  Meyers, and Burnett.  You've done a 30(b)(6) deposition of

3  Pioneer.

4        MR. SMITH:  Only on the documents.  And just to

5  clarify the record on that, we had a dispute.  In other

6  cases, what I've done is we've said, here's the 30(b)

7  deposition on this category for this defendant, they produce

8  a witness.  Here's a 30(b)(6) deposition on this category for

9  that defendant.  We got into a dispute, and he said, they

10 didn't like that.  They think that's improper.  There should

11 be one 30(b)(6) deposition notice with all categories, and

12 then they tell you who they're going to produce, and you

13 notice up those different 30(b)(6) depositions.  That's fine,

14 and there is an agreement that we would reproduce categories

15 -- all the categories we wanted, which we've never done.

16       So the limited extent of the 30(b)(6) deposition

17 that's occurred has only been those initial disclosures, and

18 then it's gone beyond that to the extent I had to ask about

19 what your background is to understand what documents they

20 might have.

21       So I don't want to go back through all that.  I've

22 kind of done that piece.  But, for example -- I mean as a

23 perfect example, Charlie Okamoto.  I didn't talk to him as

24 far as his later, you know, in depth discussions, or what he

25 knows now, or what -- you know, a lot of these different

1  kinds of things that would come out in the deposition.

2       So that's the distinction.  It wasn't a 30(b)(6)

3  deposition on all the categories we wanted.  We did just that

4  specific area.  We tried to keep it limited to that area, and

5  now we want to finish for the rest -- for the remainder of

6  the categories.  And, originally -- I mean correct me if I'm

7  wrong -- but we had an agreement to do that.

8       Okay.  And also on this 10 deposition limit, I

9  agree.  It's not -- well, first more than 10 depositions had

10  kind of always been what everyone's anticipated this would

11  take.  And so, when we're working on that, and they say,

12  well, we want to do all kinds of discovery, and I say my

13  preference is for you to depose everyone, because then at

14  least we get hard evidence of all these different clients.

15       And I give them my list of people I want to depose.

16  They pick out the people -- hey, we'll give you this person,

17  we'll give you this person.  So I didn't --

18       THE COURT:  But we're beyond that.

19       MR. SMITH:  -- we are beyond that, but I guess the

20  point I'm trying to make is that if I'd known from the

21  beginning, hey, I get 10 would those -- would have been the

22  10 I'd selected?  No.  You know, this was basically -- it was

23  handed on me on the understanding that we're going to have

24  more depositions down the road.

25       THE COURT:  Okay.

```
 1            MR. SMITH:  So I'm -- again, Your Honor, the Bruce
 2   Robinson, the Charlie Okamoto, we really want to do a
 3   30(b)(6) of Pioneer to finish that out on the other
 4   categories.  I think that's important, and then the lease
 5   negotiation witness as well, but I see your --
 6            THE COURT:  No.
 7            MR. SMITH:  -- okay.
 8            THE COURT:  Yeah.
 9            MR. SMITH:  Fair enough.
10            MR. FRIEDENBERG:  Let me respond on what I think are
11   the two open issues on depositions.
12            Mr. Okamoto, just so it's clear, he's the President
13   of Gay & Robinson.  So to the extent that you are at all
14   inclined to permit a second deposition of Mr. Okamoto, that
15   should fall in the same bucket as all the other Gay &
16   Robinson discovery that Your Honor noted before.  Let's wait
17   and see what Judge Kobayashi does in a couple of weeks, and
18   then we can make a final decision.  There's no reason why he
19   needs to be deposed in the interim.
20            Second of all, the -- I would still, even if somehow
21   Judge Kobayashi reversed both of her two prior orders in this
22   case finding the claims against Gay & Robinson -- identical
23   claims against Gay & Robinson lacking legally, I would still
24   argue that it is not proper to redepose a witness who has
25   been deposed already and whom the plaintiffs had a full
```

1    opportunity to question on any subject.

2         THE COURT:  Well --

3         MR. FRIEDENBERG:  That was -- the issue is not

4    whether Mr. Smith asked every question that he now, with the

5    benefit of hindsight, wishes he had asked at the time, the

6    question is whether he had the opportunity to ask those

7    questions.  Otherwise, that would be a way of saying you can

8    march back any witness for a second deposition as long as

9    you've deposed him or her at the beginning of the case before

10   you knew everything you know now and that's obviously not the

11   rule, particularly --

12        THE COURT:  What about the 30(b)(6)?

13        MR. FRIEDENBERG:  The 30(b)(6) is, I would say, even

14   more improper, because what we haven't heard or seen in any

15   of the many trees that have landed in Your Honor's court, is

16   any justification for particular categories that have not

17   already adequately been addressed.  The likelihood -- this is

18   just another way of trying to do more so that they can do

19   more.

20        THE COURT:  Yeah.

21        MR. FRIEDENBERG:  They've already deposed the head

22   of the operation in Waimea.  They've deposed the managers who

23   report to her.  They have explored every subject that is

24   conceivably related to the claims that they're alleging in

25   this litigation.  There's been no showing that there are

1  particular categories that these particular individuals did

2  not respond to or could not respond to, and Pioneer has been

3  deposed pursuant to a 30(b)(6) notice already.

4          THE COURT:  I thought, actually, they exchanged that

5  with you.  That's not the case, other categories --

6  information on other categories for a 30(b)(6) deposition.

7          MR. FRIEDENBERG:  There were -- well, first of all,

8  Pioneer was deposed pursuant to a 30(b)(6) notice.

9          THE COURT:  Right.

10          MR. FRIEDENBERG:  Pioneer -- multiple Pioneer

11  witnesses were produced to address each of the categories in

12  the 30(b)(6) notice.

13          THE COURT:  Okay.

14          MR. FRIEDENBERG:  Subsequent to that time, there may

15  have been an exchange of additional -- I don't frankly

16  remember at this point, because it's not part of the showing,

17  I don't think, that the plaintiffs have made, but there may

18  have been a request subsequent to that to take a deposition

19  on additional categories, but what I'm saying is that they've

20  not taken so many depositions that there is no basis to say

21  that there are categories that have been -- legitimate

22  categories that have not been addressed --

23          THE COURT:  Okay.

24          MR. FRIEDENBERG:  -- by the witnesses, and they're

25  not making that showing now.

```
 1           THE COURT:  Okay.  Mr. Smith, here's what we going
 2   to do.  I don't know that this issue has been, you know,
 3   fully discussed and addressed between the two of you on
 4   exactly what you want to do as far as an additional 30(b)(6)
 5   deposition.
 6           So I want you to conduct a further meet and confer
 7   on this with specific -- very specific matters that you feel
 8   you haven't obtained from Pioneer that you believe you need.
 9           MR. SMITH:  Okay.
10           THE COURT:  And you talk with Mr. Friedenberg about
11   that.  If you cannot agree, set a discovery conference, and
12   I'll deal with that particular issue, because I just don't --
13   I think you're on different --
14           MR. SMITH:  Your Honor --
15           THE COURT:  -- I'm not precluding it just as a
16   matter of course, but if these are matters that have been
17   covered or were part of what was noticed before, then I
18   probably wouldn't allow it, but if there's a real need for
19   some additional information here that you really -- you need
20   this and, you know, it would make sense with some scope and
21   definition, you know, I might allow it.
22           MR. SMITH:  Your Honor, if we've got it already, I
23   don't want to do the depo, frankly, and there's also -- I
24   didn't actually remember this until I just looked at the
25   footnote, but there's a minute order that Your Honor issued
```

1  allowing the additional 30(b)(6) upon the presentation of the

2  additional categories, and that's Footnote 39 to our motion.

3          THE COURT:  Okay.

4          MR. SMITH:  I think we exchanged those categories,

5  but, Your Honor, my memory is not perfect.

6          THE COURT:  Okay.  Well, you go over that and --

7          MR. SMITH:  So we will redo it.  Yeah.

8          THE COURT:  -- is that right?  You know, I --

9  there's been so many things going on in this case I don't

10  remember that myself.

11          MR. FRIEDENBERG:  What I would say, Your Honor, is

12  if a notice had been served, and it designated categories on

13  which witnesses have already testified, given that we are

14  beyond the 10 limit -- 10 deposition limit, we would move for

15  a protective order.

16          Now, what Your Honor is instructing us to do is to

17  look at the categories, see if we can work it out, and if we

18  can't we'll come back to Your Honor.  That's acceptable to

19  us.

20          THE COURT:  It sounds like maybe I authorized this

21  once before.

22          MR. SMITH:  Here's the --

23          MR. FRIEDENBERG:  Well --

24          THE COURT:  Take a look at that.

25          MR. FRIEDENBERG:  -- if that were the case, that

 1  would have been long before all of these witnesses --

 2          THE COURT:  Oh, okay.

 3          MR. FRIEDENBERG:  -- were deposed.  If that's --

 4          THE COURT:  Well, that's -- no, you have a point

 5  there.

 6          MR. FRIEDENBERG:  -- the broader context --

 7          THE COURT:  You have a point.  You have a point.  I

 8  mean we're not going to go ahead and just, you know, beat a

 9  dead horse here.  If things have been done, you know, we

10  don't need to do it again.  Okay.

11          I'm not -- you know, I'm not cutting you off at the

12  pass here.

13          MR. SMITH:  I understand.

14          THE COURT:  You guys talk about it and see what the

15  deal is.

16          MR. SMITH:  Okay.

17          THE COURT:  Okay.  You know, on Okamoto, you know,

18  wait until Judge Kobayashi rules.

19          MR. SMITH:  Okay.

20          THE COURT:  Okay.

21          MR. SMITH:  Fine.

22          THE COURT:  And then we'll take it up at that point.

23  Okay.  I think that's in on the depositions.

24          MR. FRIEDENBERG:  I believe it is, Your Honor.

25          THE COURT:  Okay.  Then we're going to hold off on

1   the Robinson discovery until there's a ruling on the motion

2   to dismiss and that takes care of the argument on all of the

3   duplicative discovery, right?

4           MR. FRIEDENBERG:  Well, certainly on the discovery

5   of the Robinson defendants, yes, Your Honor.

6           THE COURT:  Okay.  Now, here's an area that I would

7   like to talk with you a little bit about, other locations.

8           So you want information on what is going on on other

9   properties.  Well, you know, this is very property specific

10  here about, you know, what was going on in this property and

11  how it's creating dust exposure and pesticide exposure.  Who

12  cares about other properties?  Why?

13          MR. SMITH:  Yeah, sure.  Here's the reason.  So the

14  key defense for defendants is the Hawaii Right to Farm Act,

15  which they claim says we can commit nuisance, we can have

16  pesticides, we can have dust, so long as we're following the

17  GAMP, the Generally Accepted Agricultural and Management

18  Practices.

19          It's undefined by the statutes.  And so, the

20  question obviously begged is well what are generally accepted

21  agricultural practices on Kauai.  Okay.

22          THE COURT:  Okay.

23          MR. SMITH:  So you've got a cast of broader than

24  that than just that specific property to understand what

25  those practices are.  Now, that was the only reason that we

1    were asking for this discovery.  I could -- honestly, I would

2    see why Your Honor would say (indiscernible).

3           The difference is that in the depositions of --

4    well, Jill Suga for sure, and this is what I quoted in the

5    brief --

6           THE COURT:  Right.

7           MR. SMITH:  -- she said, we had prior dust problems

8    in Koloa, Lihue, and I think even Kekaha, and there's two big

9    separate distinctions of Pioneer Hawaii.  There's Pioneer

10   Parent C and Pioneer Waimea Research or Research.

11          So Parent C has dust problems, and they have a very

12   aggressive protocol for dealing with it and how they go out,

13   and they respond, and they do all this kind of thing.

14          Waimea, on the other hand, has later dust problems

15   and doesn't do any of those things.  And in fact when they

16   finally get kind of called on it -- called to the carpet in

17   front of the County Council, and the Mayor, and all this,

18   they -- and there's all these internal e-mails going back and

19   forth, and I've cited one of those, they say, well, Parent C

20   had had a dust issue at Koloa already, and we should follow

21   what they did.

22          So what I want to be able to show to the jury is

23   say, look, when you're trying to figure out what Generally

24   Accepted Agricultural Management Practices are, yes, it's

25   relevant what other farmers are doing, but Pioneer didn't

1   even follow its own practices that it had in place that they

2   did elsewhere, because of dust complaints.

3         And so, our discovery is not simply all locations,

4   it's limited to two things.  It's limited dust complaints at

5   Koloa and elsewhere -- if they're Pioneer dust complaints --

6   and it also asks for spray records at Kekaha, and I can

7   explain why that's relevant as well, but that's the reason

8   for the dust piece.

9         For the spray record piece, and frankly if Your

10  Honor wants to carve this down, I'm okay with it.  We don't

11  need this huge, you know, range of spray records, but what we

12  want to be able to show --

13              THE COURT:  Yeah.

14              MR. SMITH:  -- is that --

15              THE COURT:  I'm disinclined on that, but you want to

16  know --

17              MR. SMITH:  -- yeah.

18              THE COURT:  -- what the complaints were, what the

19  response was --

20              MR. SMITH:  That's right.

21              THE COURT:  -- in those other areas.

22              MR. SMITH:  That's exactly right.

23              THE COURT:  Okay.  What's wrong with that?

24              MR. FRIEDENBERG:  Well, first of all, that is far,

25  far less than what they've asked.

1          THE COURT:  I agree.

2          MR. FRIEDENBERG:  So --

3          THE COURT:  So you should say God bless them.

4          MR. FRIEDENBERG:  -- well, God bless -- I'll say a

5   qualified God bless them.

6          THE COURT:  Okay.

7          MR. FRIEDENBERG:  The point, Your Honor -- there are

8   two points I'd like to make, at least.  One is, as Your Honor

9   noted this is highly property specific, and in fact it is the

10  plaintiffs who have alleged that this is unique territory.

11  It is unique topography, it is unique -- there are unique

12  tradewind patterns.  And so, what happens here or what must

13  happen here is different than what must happen over there.

14         THE COURT:  Right.

15         MR. FRIEDENBERG:  The second point is the question

16  is not -- and maybe this is a subsidiary of the first

17  point -- but the question is not whether Pioneer was really,

18  really good over there, but whether what it was doing was

19  generally accepted over here.

20         And so, to go ask about every Pioneer location in

21  Hawaii, it just -- once again, it has no relevance to what

22  we're actually trying in this case.

23         THE COURT:  Okay.  Well, that's not what we're going

24  to do here.  So I do think there is relevance to knowing

25  about what these complaints were of these other specific

1   locations that you just identified, and what the practices

2   were, what the complaints were about, and what Pioneer did in

3   response to the complaints.

4          Okay.  That -- I will permit that discovery, and you

5   folks work it out on the definition of that.

6          MR. SMITH:  Okay.

7          THE COURT:  Okay.  Then we get -- I think the final

8   area is this inquiry regarding pesticides.  And so, you know,

9   Mr. Smith on this point I kind of agree with the defense

10  that, you know, to get into all of the health related issues,

11  the assessment issues that you're interested in, you know,

12  that just doesn't relate to the claims for property damage

13  here.  That really smacks more of a connection to personal

14  injury issues or if there were some water -- in other words,

15  it sounds to me like exactly what I was dealing with, with

16  the Central Oahu pineapple field water contamination, cancer

17  causing health hazard case, not the case we have here.

18         So if it relates solely to those questions

19  concerning the types of pesticides that were being used, and

20  I gather you know pretty much, you know, what they are and

21  the like, I mean I certainly would permit that, but not all

22  of it -- not all of this health-related assessment issue

23  stuff.  Okay.

24         MR. SMITH:  I don't -- okay.  I see where you're

25  going with that and, again, as I tried to explain earlier, I

1  don't know that I necessarily disagree.  I mean the case is

2  not about the -- to prove that it's caused -- that these

3  pesticides have caused, you know, little Johnny's cancer in

4  Waimea --

5          THE COURT:  Right.

6          MR. SMITH:  -- but I would disagree from the

7  standpoint that I think for a jury to be able to evaluate the

8  impact of the nuisance, it's -- there's a qualitative

9  difference between just smelling let's say chicken poop or

10 whatever from a chicken operation or a hog farm.  There's a

11 qualitative difference between that and being subjected to

12 these very dangerous chemicals that are pesticides.

13         And so, the health component, as far as the dangers,

14 you know, what the concentrations are, to me that's directly

15 relevant to the nuisance and what actual trespass occurred to

16 these people.

17         For example, if I'm exposing you here just to a very

18 obnoxious perfume or cologne, right, that's different than if

19 I walked into this courtroom, and I expose you to something

20 that's got, you know, a -- you know, a very different health

21 issue.  You know, that's a health impact.

22         So I think it's relevant, but I understand Your

23 Honor's point that that's not the primary focus of the case,

24 and we're not -- I guess that's what we're trying --

25 that's -- we're trying to walk that, okay.

1          THE COURT:  Yeah, the environmental assessments, you

2    know, the measures taken by Gay & Robinson to protect honey

3    bees and other pollinators on agricultural lands, the studies

4    or investigation undertaken to protect the river from

5    agricultural runoff and drift, the studies or investigation

6    to protect the coastal marine environment, the measures to

7    prevent the runoff or dirt pesticides from the fields.

8          MR. SMITH:  Let me --

9          THE COURT:  No.

10         MR. SMITH:  -- let me just explain, and then

11   obviously, Your Honor, can disagree with me.  The reason I

12   feel that's relevant here is as I've been saying, and I

13   certainly believe it, Waimea is an incredibly unique

14   location.  It's right at that mouth of the Waimea Canyon,

15   there's the ocean, and there's the river.

16         And so, a company that's moving into those specific

17   fields have different due diligence to do, than a company

18   that plops down in the middle of Iowa.  And that's sort of --

19         THE COURT:  Well, I may not disagree with you on

20   that point --

21         MR. SMITH:  -- right.

22         THE COURT:  -- but that's not this case.

23         MR. SMITH:  But it is this case from the standpoint

24   of in looking at what those risks are -- let's say we're

25   worried about runoff in the stream, we're worried about

1  runoff into the ocean, so maybe we should be doing things

2  like planting windbreaks, maybe we should be doing these

3  other things for these other practices.  That's why it's

4  relevant.

5       Instead, because they don't look at it, it basically

6  adds to the reasons why Pioneer was negligent when it moved

7  in there, and it didn't undertake, you know, these best

8  management practices.  That's --

9       THE COURT:  Well, I understand --

10      MR. SMITH:  -- that's part of it.

11      THE COURT:  -- your point.

12      MR. SMITH:  Okay.

13      THE COURT:  I understand your point.  I disagree --

14      MR. SMITH:  Okay.

15      THE COURT:  -- but I agree with the defense on this

16  issue.  Okay.  Okay.  Have we covered everything?

17      MR. SMITH:  Yes.

18      MR. FRIEDENBERG:  I believe have, Your Honor.

19      THE COURT:  Mr. Friedenberg, prepare an order that

20  memorializes all of these points.  That's your punishment.

21      MR. FRIEDENBERG:  That's your God bless you to me.

22      THE COURT:  That's your God bless you to you,

23  exactly.

24      MR. SMITH:  Thank you, Your Honor.

25      THE COURT:  Okay, guys, as best you can try to

1   cooperate.

2          MR. FRIEDENBERG:   Thank you, Your Honor.

3          THE COURT:   We'll get through it.

4          MR. SMITH:   Thank you, Your Honor.

5          THE COURT:   Always a pleasure.

6          (Proceedings were concluded at 11:51 a.m.)

1

2

3                        CERTIFICATE

4          I certify that the foregoing is a correct transcript

5   from the official electronic sound recording of the

6   proceedings in the above-entitled matter.

7

8

9   _____          October 29, 2013.

10  Jessica B. Cahill, CET*D-708

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25