```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF HAWAII

 3
     JIM AANA, ET AL., on behalf  ) CIVIL NO. 12-00231
 4   of themselves and all        )
     others similarly situated,   ) Honolulu, Hawaii
 5                                 ) June 23, 2014
                 Plaintiffs,      ) 10:30 A.M.
 6                                 )
           vs.                     ) Plaintiff's Motion for
 7                                 ) Preliminary Injunction
     PIONEER HI-BRED              ) And Partial Summary Judgment
 8   INTERNATIONAL, INC., a        ) for DuPont Pioneer's Misuse
     DuPont Business and Iowa      ) of Bee-Toxic Pesticides
 9   Corporation, et al.,          )
                                   )
10               Defendants.       )
                                   )
11   _____   )
                                   )
     JEFFREY CASEY, ET AL.,        ) CIVIL NO. 12-00655
12                                 )
                 Plaintiffs        )
13                                 )
           vs.                     )
14                                 )
     PIONEER HI-BRED              )
15   INTERNATIONAL, INC., a        )
     DuPont Business and Iowa      )
16   Corporation, et al.,          )
                                   )
17               Defendants.       )
                     TRANSCRIPT OF PROCEEDINGS
18          BEFORE THE HONORABLE LESLIE E. KOBAYASHI
                    UNITED STATES DISTRICT JUDGE
19
     APPEARANCES:
20
     For the Plaintiffs:      Patrick Kyle Smith
21                            Lynch, Hopper, Salzano & Smith
                              970 N. Kalaheo, Pali Palms,
22                            Ste A301
                              Kailua, HI 96734
23

24

25
```

```
 1    APPEARANCES (CONT'D):

 2
      For the Plaintiffs:      Gerard A. Jervis
 3                             Law Offices of Gerard A. Jervis
                               354 Uluniu St Ste 100
 4                             Kailua, HI 96734

 5    For the Defendants:      Michael Purpura
                               Michael J. Scanlon
 6                             Carlsmith Ball LLP Honolulu
                               American Savings Bank Tower
 7                             1001 Bishop St Ste 2200
                               Honolulu, HI 96813
 8
                               Clement L. Glynn
 9                             Billie D. Hausburg (By Telephone)
                               Glynn & Finley, LLP
10                             One Walnut Creek Center
                               100 Pringle Avenue, Suite 500
11                             Walnut Creek, CA 94596

12    Official Court          Cynthia Ott, RMR, CRR
      Reporter:               United States District Court
13                             P.O. Box 50131
                               Honolulu, Hawaii  96850
14

15

16

17

18

19

20

21

22

23

24
      Proceedings recorded by machine shorthand, transcript produced
25    with computer-aided transcription (CAT).
```

```
 1   MONDAY, JUNE 23, 2014                          10:30 A.M.
 2            THE CLERK:  Civil 12-00231LEK-BMK, Jim Aana, et al.,
 3   versus Pioneer Hi-Bred International, Incorporated et al., also
 4   calling Civil 12-00655LEK-BMK, Jeffrey Casey, et al., versus
 5   Pioneer Hi-Bred International, Incorporated, et al.  These
 6   cases have been called for a hearing on the plaintiff's motion
 7   for preliminary injunction and partial summary judgment for
 8   Dupont Pioneer's misuse of bee-toxic pesticides.
 9            Counsel, please make your appearances for the record,
10   starting with counsel participating by telephone.
11            MS. HAUSBERG:  This is Billie Hausberg appearing for
12   defendants.
13            MR. SMITH:  Good morning, Your Honor.  Kyle Smith on
14   behalf of the Waimea plaintiffs.
15            THE COURT:  Good morning.
16            MR. JARVIS:  Good morning, Your Honor.  Gerard Jarvis
17   on behalf of plaintiffs Aana.
18            THE COURT:  Good morning, Mr. Jarvis.  Mr. Purpura.
19            MR. PURPURA:  Michael Purpura and Michael Scanlon on
20   behalf of defendants, and, Your Honor, I'd like to introduce
21   Clement Glynn who is our colleague and co-counsel on this
22   matter.  You've not yet met him, you've met his partner, Adam
23   Friedenberg.  Mr. Glynn will be arguing today.
24            THE COURT:  All right.  Good morning to all of you.
25            MR. GLYNN:  Good morning, Your Honor.
```

1          THE COURT:  I look forward to your arguments.  It's

2    been very interesting reading through all of your submissions.

3    For the plaintiffs, it would be really helpful for me on two

4    areas, of course, you know the case better than I do, I don't

5    mean to limit your argument in any way, the two arguments that

6    the defense has raised, that would be particularly helpful to

7    me if you could address is, is there sufficient notice in the

8    complaint that -- I agree that you folks did put in that you

9    want injunctive relief, but specifically having to do with

10    effect on bees.

11          I think you have thoroughly set forth a claim

12    regarding pesticide use, but I've looked through it, and maybe

13    I missed it, you know, where it has to do with bees, because up

14    to now we certainly have heard motions and motions to dismiss

15    and revised complaints and so forth having to do with the

16    effect of the pesticides on quality of life, on, you know, the

17    dust and the nuisance basically of it.

18          Second issue for the plaintiffs has to do with

19    standing for the bees, and of the submissions, it appears that

20    two of the plaintiffs, Allen Arquette and Wolfgang Langlois,

21    have affirmatively stated that they raised bees.  None of the

22    other plaintiffs, there's any indication that they have bees,

23    so for standing.  Now, Mr. Aana was mentioned, I think in your

24    submissions, but in the first line of his affidavit, he says

25    he's a taro farmer.  I didn't see anything about bees.

1          So if you could address standing, and see that if the

2    court did find that there was notice and did go through all the

3    Winter factors and found, you know, and so forth, would it be

4    correct that only these two would have standing with regard to

5    the injunction -- injunctive relief side.

6          For the defense, one of the arguments that you folks

7    raised is, hey, we don't, you know, of all of these pesticides

8    they complained about, literally only one contains a label that

9    says we need to warn beekeepers within a mile radius of the

10   use.  And we don't use or we haven't used it since I think 2012

11   or maybe it was 2011.  But anyway, we're not currently using

12   it, and therefore, it's not appropriate for injunctive relief.

13   But I guess I would ask you to address whether or not it falls

14   in those line of cases where the activity may not be currently

15   going on, but it's reasonably capable of repetition.

16         So for instance, it might be some sort of activity

17   that takes place yearly or could -- you know, has been done in

18   the past, isn't being done recently.  So I think where the

19   plaintiffs are coming from, it doesn't prevent you folks from

20   using this pesticide.  You have in the past.  You haven't,

21   allegedly they claim, complied with the label requirements.

22   They're entitled to injunctive relief if they can show the

23   Winter requirements, even though your clients may not be

24   currently using it.  So if you could address that.

25         All right.  Thank you.  And any other arguments you

1    have for the court.  I don't mean to limit you as well.

2    Mr. Smith, will you be arguing?

3              MR. SMITH:  Yes, Your Honor.

4              THE COURT:  And at podium or counsel table if you have

5    things that you need to look at and it's too cumbersome to go

6    to the podium, I'm perfectly happy to hear from you from

7    counsel table.

8              MR. SMITH:  Thank you, Your Honor.  If it's okay, I

9    will just go from counsel table.

10             THE COURT:  You may, as long as you speak into the

11   microphone for our wonderful court reporter.

12             MR. SMITH:  I will.  I'm a bit of a klutz, so just

13   making all of this up there anyways might be risky.

14             I actually want to keep my arguments as brief as

15   possible.  I know from past experience with Your Honor that you

16   spent a lot of time with all of the exhibits and the motion and

17   that.

18             THE COURT:  You certainly give me a lot to read, thank

19   you.

20             MR. SMITH:  I apologize, it's --

21             THE COURT:  No, no, I'm happy to receive the

22   information.  I'm just kidding.

23             MR. SMITH:  No, no, some of these exhibits are quite,

24   even though the concepts are fairly simple, some of the

25   exhibits are very voluminous because it's a lot of records and

1    that kind of thing, so -- so I want to start with really what

2    is not in dispute, which is essentially that we know Pioneer

3    uses these bee-toxic pesticides.  There's undisputed sworn

4    deposition testimony that bees are present on the Pioneer

5    fields throughout the year, particularly during pollination.

6         There is no dispute that violation of the label is a

7    violation of federal and state law.  It's definitely not

8    disputed.  And also that Pioneer does not check for bees before

9    spraying in its fields, and it certainly doesn't warn Waimea.

10         So all of the things that we sort of laid out for Your

11    Honor as far as the real underpinnings of our motion are not in

12    dispute.  I think what is disputed are a couple of the -- well,

13    one, there's a representation by Mr. Kopytowski, who is

14    essentially responsible for Pioneer's agronomy, so he oversees

15    the farming aspect.  And he makes a representation to the court

16    that he has reviewed records which have not been produced in

17    this litigation that essentially exonerate them.  And if you

18    look at these records -- and he promises us that he has, if you

19    look at these records for the one field example we provided,

20    Your Honor, again, we just chose one because there's a lot of

21    them --

22         THE COURT:  Right.

23         MR. SMITH:  -- that if you look at that, that they

24    kept a record of when the pollination occurred, and so that

25    they can tell you that no pesticides were applied during that

1    period except for one.  And the pesticide that was applied

2    during that period was one that they contend they were allowed

3    to apply later in the evening.  So that's sort of evidence from

4    an evidentiary standpoint.  It's the primary position of the

5    defendants.  So I want to talk about that just for a second.  I

6    also want to talk about the label language for a second, and

7    then I'll address your points as well.

8         So first, as far as this concept of summary judgment,

9    preliminary injunction, what have you, meeting proof with

10   proof, Mr. Kopytowski's representation in his declaration does

11   not state that he was out there personally spraying, doesn't

12   state he was personally observing when pollination occurred, it

13   especially doesn't state he was personally keeping track of

14   what bees were in the field.  Instead essentially he claims he

15   has reviewed records and those records are now being offered to

16   Your Honor essentially as it's an out-of-court statement that

17   they're true, and we're supposed to just accept that.

18        And so one of the positions that I offered in our

19   opposition, pardon me, in our reply was essentially, well, if

20   that's the case, let's put it out there, and let's make a

21   decision based upon the real evidence.  Certainly from the

22   standpoint of, if I was in the defendant's shoes, and I have a

23   record that ostensibly exonerates our conduct, then that should

24   be attached.  And we certainly attached these -- these labels

25   and these records for these different fields specifically for

1    that purpose.

2         I would also note that even in the declarations when

3    they talk about this generally 60-day period of pollination,

4    that Malathion application was well after the 60 days.  Now, if

5    during that period of time that's when pollination was

6    occurring and they kept records and they kept track of whether

7    or not bees were visiting the field, so be it.

8         And I'll be the first, if those records exist, at

9    least for that applications on those fields, I'll come in front

10   of Your Honor and say you're right, Your Honor, they've

11   produced the record to the court and us, and it shows that they

12   were applying for that field for that day, at least, correctly.

13        But what I suspect is that those records are nothing

14   of the sort, and it's not kept track of.  And certainly from

15   the standpoint of looking and when a label says do not apply

16   when bees are visiting fields, it seems to me like it would

17   make sense before you apply that pesticide to go out and check

18   and see if bees are in the field, not just if pollination is

19   occurring or not.

20        So I just -- I wanted to address that point in my

21   opinion, and certainly our argument is that the primary

22   evidentiary basis to avoid summary judgment is not in evidence.

23   It's total hearsay.  And it's no different than me claiming or

24   one of my clients claiming, hey, we've got records outside that

25   we're not showing Your Honor, but we promise you this is what

1    occurred.  And that's not a basis to oppose our motion.  I

2    would also want to point out that this argument in the

3    opposition because a lot of things were kind of put out there,

4    colony collapse disorder, and oh, sometimes we bag ears and

5    sometimes we bag tassels, and sometimes we do these other

6    things.  That's great if that occurred 100 percent of the time

7    and they can show it, but there's no evidence supporting any of

8    those facts.

9         There's a key representation that's made in the

10   opposition that essentially groups all of these labels

11   together.  And it says, what the labels say is they

12   don't -- actually, probably, Your Honor, so I'm reading from

13   Mark Wright's declaration, this is paragraph five, and he says,

14   product use is only limited, not prohibited.

15        And I can find the specific exhibit for Your Honor, I

16   don't recall the letter off the top of my head, but this is the

17   declaration of Mark Wright --

18        THE COURT:  Okay.

19        MR. SMITH:  -- their expert in support of their

20   opposition.

21        THE COURT:  All right.

22        MR. SMITH:  And paragraph five, what he says is

23   that -- I believe this is Exhibit 10 to their opposition,

24   paragraph five.  This is on page three.  And it's the second to

25   last sentence where it says instead, and it says, "instead,

1  product use is only limited, not prohibited, during that phase

2  of crop development during which bees may be foraging.  During

3  this time, pesticide labels typically direct that applications

4  should occur at times of day, and that's in bold, when bees are

5  less active.

6      And if you noted in their opposition, what they

7  basically say is, Judge, all our applications are okay.  We're

8  using these in the evening.  You know, we use them after bees

9  go to bed and we use them in the morning before they wake up

10  and get their coffee, I guess.  And so everything is safe,

11  right?

12      The only label that they've cited that actually says

13  that, that it can be used later in the day is Sevin.  It's the

14  only one I could find.  And if there's another one they'd like

15  me to look at, I'd be happy to look at it.  Sevin allows you to

16  use it in the evening.  You're not supposed to if you want to

17  avoid harm to bees, but if you have to use it, you can use it

18  in the evening.  What I would urge Your Honor to consider is

19  remember that in Sevin, there's also an express requirement

20  that states you ought to be providing a warning out to

21  beekeepers within a mile.  And so what beekeepers can do, 48

22  hours in advance, the beekeeper can then put out, what they do

23  typically is put out sugar water and that keeps the bees in the

24  area.  So you can do that and then you can use it in the

25  evening.

1          The vast majority of the rest of these labels don't

2    say anything of the sort that you can just use them in the

3    evening, instead there is an outright prohibition.  And the

4    example I cited in the reply is from the Dupont, its own Asana

5    label, and I have -- I have that label if Your Honor would like

6    to see it.  I think it's also cited actually in the reply

7    itself, if I can find it.

8          I'll read it to you.  It says, "This product is highly

9    toxic to bees exposed to direct treatment or residues on

10   blooming crops or weeds.  Do not apply this product or allow it

11   to drift to blooming crops if bees are visiting the treatment

12   area."

13         I want to just talk about what that specifically says.

14   Your Honor, I have the actual label here.  It's from Exhibit 3

15   to our motion as well.  If you'd care, I can approach.

16         THE COURT:  Exhibit 3 to your motion?

17         MR. SMITH:  Exhibit 3 has all those labels.  It's kind

18   of -- yeah.

19         THE COURT:  Right.

20         MR. SMITH:  So --

21         THE COURT:  So which label are you referring to, what

22   was the --

23         MR. SMITH:  This is the Dupont Asana label.  As I

24   said, Your Honor, I've got a copy.

25         THE COURT:  Is it before or after the Sevin?

1          MR. SMITH:  I believe it's after.

2          THE COURT:  After, okay.  Oh, it might be on the disk.

3    Anyway, you can just read from it.

4          MR. SMITH:  I'll just read from it.  The reason it's

5    relevant -- I'll tell you what would be useful then, if you

6    turn to Exhibit 2 to our motion, it's the chart that has the

7    different --

8          THE COURT:  Yes.

9          MR. SMITH:  The actual warnings pulled from the

10   different labels.

11         THE COURT:  Okay.

12         MR. SMITH:  And so Asana is number two.

13         THE COURT:  Okay.  Got it.

14         MR. SMITH:  So that's the key bee warning.  And I just

15   want to mention this for a couple of different reasons is that

16   this is not a -- this is an express prohibition, contrary to

17   Dr. Wright's representation.  This is not a, hey, you're just

18   supposed to limit it with bees, if bees are present and

19   visiting the area, do not apply.

20         It's also key -- and you can compare the different

21   labels between them and you really only get this after spending

22   a lot of time with the labels, the labels are very specific.

23   There is a difference between when bees are visiting the

24   treatment area and when bees are actively visiting the

25   treatment area.

1          So if you look down at number 10 for larva on 3.2, it
2     would say, this product is toxic to bees exposed to direct
3     treatment.  Do not apply this product or allow it to drift to
4     blooming crops when bees are actively visiting.  Now, the
5     difference between that and say Asana, for example, is Asana is
6     direct treatment and residues, and it doesn't have that
7     actively visiting.
8          So this claim that as long as we wait till after the
9     bees go to bed, then we're okay, there's no label basis for
10    that practice.  In fact, many of these labels say these things
11    are toxic for days after you apply.  And so it's all the more
12    important, I think, that when bees -- pesticides are being
13    applied that they track where bees are, which they don't, and
14    instead the representation is essentially that they're
15    everywhere when they're using them.
16         I also just for the -- for the purpose of sort of --
17    to the extent that there's a discussion today about it, it's
18    important to understand the way farming occurs at the Waimea
19    Research Center.  This is a research center, it's not a
20    cornfield.  And the key difference is that if you look at sugar
21    cane or corn, or where I grew up soybean or something, it's a
22    fence row to fence row application.  So you plow the whole
23    field, you plant the whole field.  There'll be one growing
24    season typically a year, and there'll be an application of
25    pesticides if necessary, you know, two, three, however many

1    times during the year.

2         What occurs at Pioneer is there is a quilt of

3    different crops, and we're doing the research on this one, and

4    research on this one, and research on this one.  And they all

5    have different plant dates, and they all have different spray

6    dates.  They all have different harvest dates, and they can be

7    right next to each other.

8         So that one got planted three weeks ago, one gets

9    planted today, one gets planted three weeks from now.  And so

10   that course of insecticides is on a sort of routine basis.  And

11   when I asked Mr. Myers in his deposition he explained that.  He

12   said, yeah, we basically do it once a week all the way through

13   pollination.  Again, that's the sworn deposition testimony.

14        So what that means is if pesticides are being applied,

15   this idea that they're applied once and the whole field is

16   safe, it doesn't mean that.  It means you could have a

17   pollinated crop right next to it, bees are flying through.

18   I've been out on those fields when we did our inspection, our

19   expert that offered his affidavit, he's been on those fields,

20   and not only are the crops at different stages the entire time,

21   there's also all sorts of weeds and cover crop being planted

22   that's also in bloom.  You've got pollinators essentially

23   everywhere.

24        So what it requires is if you're going to use these

25   kinds of very dangerous pesticides on this operation, the

1    utmost care must be taken, if you're going to follow the label.

2    And that just simply on its face didn't occur.  And there's

3    really no dispute on Sevin that that didn't occur, but they

4    asked Your Honor not to grant an injunction because we won't

5    use it in the future and we promise to do better.  That's not

6    particularly reassuring for my clients.

7            They even blame my clients for not telling them to

8    warn them about pesticides they didn't know they were using.

9    Again, it's rather disingenuous.  That burden under both the

10   label with respect to Sevin and also just under Hawaii law is

11   that once they became aware of a danger to others, in this case

12   to that community, they have an obligation to take some steps,

13   to do some reasonable steps.  And the clear admission, if you

14   will, within the opposition is that we did no steps.  We didn't

15   know, we didn't take any effort to.

16           THE COURT:  How are they supposed to find the

17   beekeepers?

18           MR. SMITH:  Sure.

19           THE COURT:  They weren't listed on -- these two,

20   right, Mr. Arquette and Mr. Langlois were not listed on the

21   beekeeper list.

22           MR. SMITH:  You're right.  I don't believe it was even

23   in use, you know, going back before when a lot of this

24   occurred.

25           THE COURT:  Right.  The Hawaii registry.

1           MR. SMITH:  The registry.

2           THE COURT:  When you had one for the island, I think.

3           MR. SMITH:  That's right.  So that's a good question.

4    So how does Pioneer every other time when it wants to notify

5    this community, which is a long-standing agricultural community

6    with its farmers markets in there once a week, how do they

7    notify this entire community about everything else that they're

8    doing if they want to, like open houses and stuff?

9           It's simple.  There's a post office box, everyone that

10   gets their mail at the post office box because the numbering,

11   if you ever tried to find the houses in there, the numbering is

12   rather haphazard.  So they do a direct mail, little cards,

13   every single one of those post office boxes, it goes to

14   everybody.  It's super simple.  I mean, it would take five

15   minutes to draft the post card, an hour to print it up, that

16   afternoon you would have it in the mail.

17          THE COURT:  You're saying direct mail basically.

18          MR. SMITH:  Sure, absolutely.  It's very simple.

19          THE COURT:  Okay.

20          MR. SMITH:  And certainly there's a long-standing

21   knowledge that Waimea has corn farms up in the valley.  We have

22   taro farms.  There's mango production, you know, one of the

23   most famous poi mills is there.  So this idea that we weren't

24   aware that there might be other farmers impacted by our

25   operations is --

```
1          THE COURT:  Not other farmers, but beekeepers, because
2    we're talking about bees, right?
3          MR. SMITH:  Sure.  We are.  But if you think about all
4    of the mangos and fruit trees and all that, it requires bee
5    pollination.
6          THE COURT:  Well, but they have no control over those
7    bees.  So you told like all these mango farmers well, you know,
8    they couldn't take any steps, but it's the -- it's the hive
9    keepers.
10         MR. SMITH:  I recognize --
11         THE COURT:  Yeah.  That's what I mean the notice to
12   those --
13         MR. SMITH:  Yeah.
14         THE COURT:  -- having beehives.  But okay, you're
15   saying direct mail, they could have -- they don't know who the
16   beehive keepers are, but if they notified everybody in the
17   community by direct mail, that would have covered it?
18         MR. SMITH:  Yeah, and that's certainly what they've
19   done in the past is direct mail when they wanted, going back a
20   long time when they wanted to do any other kind of
21   notification.  So this kind of brings us sort of a segue to the
22   standing issue.
23         THE COURT:  Yes.
24         MR. SMITH:  As far as we know, there are two main
25   clients with hives are the Arquettes and also Wolfgang
```

1    Langlois.  And so those are the two with hives that are managed

2    on the property.  Those hives are managed both for honey

3    production just for self-use and selling and that kind of

4    thing.  And also one reason why the farmers typically allow

5    beekeepers to keep hives on their property is because they

6    raised crops that are pollinated by bees, things like fruit

7    trees and all of these kinds of things.

8         So those are the two main hives.  So as far as direct

9    standing on a property interest in this case, those would be

10   the two that would have it.

11        THE COURT:  Okay.

12        MR. SMITH:  Now, the other people in the community who

13   have testified and say we're seeing a reduction in production

14   for fruit and this kind of thing, I can make that argument, but

15   as far as the actual warning to a beekeeper, those are the ones

16   that need it.  And I'll also tell you, those are the two of my

17   clients I'm aware of.  We don't represent every person in that

18   community.  There may very well be others.  I don't know that.

19   But likewise, you know, these fields border a lot of other

20   land, and so there could be, you know, other hive keepers

21   elsewhere around the fields.

22        THE COURT:  Right.  But you haven't identified any of

23   them.

24        MR. SMITH:  Yes, that's correct, Your Honor.

25        THE COURT:  Within those two.  Okay.

 1          MR. SMITH:  I think the -- so I think that really, I

 2   hope, addresses sort of the question of the notice and the --

 3   well, certainly the standing.

 4          THE COURT:  Standing, yeah.

 5          MR. SMITH:  Let's talk about just the notice.

 6          THE COURT:  Okay.

 7          MR. SMITH:  So what Jwala said and what they've said

 8   in their opposition is they weren't aware there were beekeepers

 9   in Waimea, and so therefore, they didn't take steps.

10          THE COURT:  Right.  No, I meant notice in terms of

11   notice pleading.

12          MR. SMITH:  Okay.  Sure.

13          THE COURT:  Yeah.

14          MR. SMITH:  Sorry, I got off track.  Yes.

15          THE COURT:  I understand what you're saying.

16          MR. SMITH:  Okay.

17          THE COURT:  And I totally get your argument with

18   regard to that.  You're saying, well, it's not like the middle

19   of New York City and you have to notify millions of people.

20          MR. SMITH:  That's right.

21          THE COURT:  I get what you're saying on that.  So now

22   you're going to go on to the notice pleading issue.

23          MR. SMITH:  Yes, Your Honor.

24          THE COURT:  Okay.

25          MR. SMITH:  So I have a copy of the complaint.

1          THE COURT:  Yes.

2          MR. SMITH:  And we certainly cited the paragraph that

3    talks -- that specifically references bees with respect to the

4    kinds of environmental harm that we're concerned about.  And so

5    that paragraph would be page 24 of the complaint.

6          THE COURT:  Right.  You talk about the harm in general

7    to the -- as a result of the pesticides, but where is there

8    anything about bees?

9          MR. SMITH:  Sure.  So in -- and I take it we're -- so

10   let me set the argument up first and I'll back up why we think

11   it's relevant.

12         THE COURT:  Okay.

13         MR. SMITH:  So paragraphs 120, it says that dust and

14   pesticides from the test fields allowed by Pioneer and the

15   Robertsons negatively impact the local environment of Waimea

16   including local corn and taro farms, local honey bee

17   populations, the adjacent Waimea River, the ocean and coral

18   reef which have all long predated Pioneer's testing of GMO

19   crops adjacent to Waimea on land leased from the Robinsons.

20         So their specific reference to honey bee population as

21   being one of the examples of environmental harm.

22         THE COURT:  Okay.

23         MR. SMITH:  I would also note in our discovery, which

24   was also attached to our motion, we have specific discovery

25   requests that ask for admissions and production of documents as

1    far as what steps are you taking to protect bees.

2          What is the -- what is the potential hazard to bees in

3    Waimea.  And the -- let me find that.

4          THE COURT:  Right.  I think that's, is that Exhibit

5    12?  The response to plaintiff Jim Aana's request for

6    admissions 1 through --

7          MR. SMITH:  Yes, Your Honor.  And it is specifically

8    request number 37.  "Please admit that pesticides used by

9    Pioneer in its Waimea fields posed potential hazards to

10   populations of honey bees and other pollinators near Waimea."

11   They objected, and then they denied their use of pesticides

12   posed a potential hazard.

13         39 below that is just if any warning of any kind has

14   been provided about any pesticide use, and they admit that.

15         THE COURT:  Okay.

16         MR. SMITH:  But let me step back to why that these

17   environmental issues are relevant is because we specifically

18   allege in the complaint a violation of 149(a), and that's the

19   Hawaii pesticide law.  And this would be paragraphs 110 to 112

20   is where the statute is laid out, but it discusses it through

21   the complaint.  And essentially what 149(a)-31, it prohibits

22   the use of pesticides in a manner that presents an unreasonable

23   adverse effect on the environment, which includes any

24   unreasonable risk to humans or the environment with

25   consideration for the economic, social, and environmental cost

1    and benefits of these pesticides.

2            And then we walk through the analysis below in the

3    complaint.  What this specifically is in there and goes to is,

4    A, violations of such, these statutes, whether this is an

5    unreasonable risk to -- actually, I'm sorry, I was going to

6    quote the language in the footnote, but I think I already said

7    it out loud which is just the definition of unreasonable

8    effects on the environment.  It means humans and the

9    environment.  And it's the economic, social, and environmental

10   cost and benefits.  So the reason that's relevant is for two

11   reasons.  First, a violation of a state statute such as 149(a)

12   would be relevant for the question of negligence of whether or

13   not they're using these pesticides appropriately.

14           And so you have to take into account what's the

15   risk/benefit analysis for humans and the environment versus the

16   social, economic, and environmental cost.  And so that has to

17   be weighed so that when a pesticide applicator says I want to

18   use X, I have to have some kind of understanding of what those

19   risks are to decide if it's a reasonable use or an unreasonable

20   use.

21           So for that issue of negligence for sure, it's

22   relevant.  But it's also very, I would say, directly relevant

23   to the key defense in this case, which we filed a motion on, on

24   the Right to Farm Act that we don't think it applies, but to

25   the extent Your Honor said it -- thought it applied, what the

1    Hawaii Right to Farm Act basically says is if they're following

2    generally accepted agricultural and management practices.  And

3    so those are not defined in Hawaii.  And so presumably may be a

4    question of fact, I guess, but certainly a piece of that would

5    be, well, if you're following generally accepted agricultural

6    management practices, are you using these pesticides

7    appropriately.

8            Are you using them -- are you providing the warnings,

9    for example, that Southern requires?  Are you applying these to

10   pollinating fields?  So these go to whether or not they

11   followed Gamp [phonetic].  And if they didn't, then that's sort

12   of one more nail in the coffin of why they don't get access to

13   that defense.  And so that's certainly another reason.

14           I'll also just mention from the standpoint of the use

15   and enjoyment of everyone's -- of these beekeepers' land, but

16   also just some of the testimony that we attached, there's a lot

17   of attachment to what the environment has been like

18   historically in Waimea, and seeing pollinators and bees and

19   having, you know, hives at least on the Arquettes and on

20   Wolfgang's property, that's also relevant.

21           THE COURT:  Right.  Okay.  So two things.

22           MR. SMITH:  Sure.

23           THE COURT:  On the notice, so you say local honey bee

24   population, I understand what your argument is, as opposed to

25   when you're in the complaint, you're saying in the ocean and

1    the coral reef.  Now, you know, it's not all of a sudden you're

2    saying I have this guy who fishes, and now he can't, you know,

3    his catches are less or, you know, he can't find certain kinds

4    of fish.  You're saying we specifically said local honey bee

5    population and then in our discovery requests, we specifically

6    directed them to hazards to honey bees and pollinators --

7    pollinators or other pollinators, you're saying near Waimea.

8         So anyway, you specifically mentioned honey bees in

9    your discovery, so you're saying it shouldn't come as any

10   surprise.

11        MR. SMITH:  Sure.

12        THE COURT:  So that they were given some notice.  I do

13   have a problem with you folks generally referring to the

14   adjacent Waimea River and the ocean and the coral reef.  I

15   don't know if that puts anyone on notice on anything, but I

16   hear what your argument is mentioning, specifically, local

17   honey bee population and then asking for discovery on it.

18        MR. SMITH:  Thank you, Your Honor.  With that said

19   I --

20        THE COURT:  But if you're arguing that more people

21   have standing because, I mean, I appreciate honey bees and I

22   know what their importance is, but I'm not sure that just

23   having that would have standing to bring a lawsuit.  Now the

24   people who actually have active hives on their property, I

25   think they would have standing.  I think we all agree they

1    would have standing, but if there's notice, sufficient notice.

2         MR. SMITH:  This is -- to some extent, I'm cautious to

3    even bring it up again because we've pushed through some of

4    these arguments.

5         THE COURT:  Right.

6         MR. SMITH:  But there's definitely the -- if I'm out

7    for a walk and I see a misuse of pesticides.

8         THE COURT:  I know, loss of enjoyment.  I understand

9    what you're saying.

10        MR. SMITH:  Not even that.

11        THE COURT:  Okay.

12        MR. SMITH:  Let's just say I'm just in Waimea, I don't

13   own property or anything there, but I see someone misusing

14   pesticides for sure, right, I would have standing simply to

15   enforce the state statute as a private right of action because

16   it's there to protect and defend the environment, and that's

17   the linchpin for it.

18        But to be honest, Your Honor, I don't think we need to

19   get to that question for today, simply because we do have

20   actual honey beehive owners --

21        THE COURT:  Right.

22        MR. SMITH:  -- with them on the property.  The last

23   point I think I would -- I would say and I don't want to sort

24   of beat a dead horse, but we're willing to, if that document is

25   produced that allegedly says, hey, there's -- we'll pollinate

1   on this field and pollinate on this field, and we can cross

2   reference that, we're willing to defer that so we can really

3   see that proof.  And then there's a real undisputed evidentiary

4   standpoint to render a ruling on that.  I don't know that it's

5   necessarily needed in order to issue the injunction as far as

6   the success on the merits, but we did make that offer.

7        And then certainly on the partial summary judgment,

8   there's an argument within the opposition that, well, you're

9   not entitled to summary judgment because you haven't proved

10  causation and damages yet.  We recognize that.  We didn't take

11  that shot, so to speak, in this brief, we really focused on

12  that, a duty to warn and also a breach of those duties, and

13  certainly with respect, I think we've shown the duty to warn,

14  both -- let's just talk about Sevin, for example, there's

15  really no dispute, I think, that, hey, we should have provided

16  some warning, that's what it requires and no effort was made.

17       There's this tenuous representation they won't do it

18  in the future, frankly, I don't think that's good enough just

19  on Sevin.  Aside from Sevin, where you have these other

20  pesticides where you know they're dangerous but it doesn't

21  specifically tell you what you need to do, how do you avoid

22  that risk?  That's where Hawaii common law and other states'

23  common laws come into play just as a reasonable pesticide --

24  user of pesticide, a reasonable farmer.

25       When someone tells you something's dangerous

 1    potentially to your neighbors and others, what kind of steps

 2    would you take, and that's really the Kajiya.  And I would note

 3    although there is some discussion in the opposition about

 4    Bennett and Larson, there's really no challenge to Kajiya that

 5    there's this underlying duty that once they're put on notice,

 6    if you will, from these pesticide labels, they have to do

 7    something.

 8           Now, we could argue if they had done something whether

 9    that something was reasonable, but what they did was nothing.

10    And so on its face, we contend that's a breach.  So I very much

11    appreciate your time, Your Honor.

12           THE COURT:  All right.

13           MR. SMITH:  Thank you very much.

14           THE COURT:  Thank you, Mr. Smith.  It's going to be

15    Mr. Glynn, he's going to argue?

16           MR. GLYNN:  Yes, Your Honor.

17           THE COURT:  And, sir, if you would like to argue from

18    counsel table or the podium, whichever area you'd like to argue

19    from.

20           MR. GLYNN:  I'm propped up on either side, so I think

21    I'll stay here, Your Honor.

22           THE COURT:  Wise choice.

23           MR. GLYNN:  Thank you.  And good morning to you, Your

24    Honor.

25           THE COURT:  Good morning.

 1          MR. GLYNN:  Let me just start with your questions, and

 2   I want to start with your first question to the plaintiff which

 3   is, does the complaint fairly under the most liberal reading of

 4   Rule 8 give notice of a claim for loss to bees?  This complaint

 5   is more than a hundred paragraphs long, as you well know,

 6   having been through it a number of times.

 7          THE COURT:  Yes.

 8          MR. GLYNN:  And it has claims, but it also has a long

 9   narrative.  The only reference to bees occurs in one paragraph

10   as part of the broad narrative.  Further, in discovery that we

11   initiated and we've submitted this with our papers and we asked

12   for all of the information about damages, not a word about

13   bees.

14          So this is really a -- not a claim that's been

15   asserted in the complaint.  And if you need a comparison, then

16   I would refer the court to the two cases relied on from out of

17   state by plaintiffs, Anderson and Bennett.

18          And in each of those cases, which are remarkably

19   distinct from our fact pattern, commercial beekeepers gave

20   prior notice to the applicator of their presence of their

21   commercial hives, and they allege that notwithstanding them

22   having taken that step, applications were made in direct

23   violation of the labels, not the kind of violation conjured

24   here, but actual violations, and that as a result they suffered

25   the loss of bees.

1          They didn't just allege it, they had experts who

2     promptly analyzed the bee carcasses, found chemical residue

3     that matched the chemical that had been applied by the

4     applicator.  So in those cases, those were definitely claims

5     for damage to bees.  That is not what has gone on here.  And I

6     might just mention that in one of those cases, Sevin, which was

7     featured in the plaintiff's motion, was the product.

8          And the problem was that the applicator had applied

9     it, I believe, by helicopter, if I'm correct, none of ours in

10    this case are aerial applications, nor is that alleged.  And

11    the application allegedly took place between 9 a.m. and noon

12    which is the height of bee activity.  I think everybody --

13    nobody disputes that.

14         So for whatever reason, the applicator there ignored

15    the label, they -- a massive bee killoff ensued and the court

16    said it was error to grant summary judgment in favor of the

17    applicator.  So I think in -- under the most liberal reading of

18    Rule 8, there's no claim that it was ever alleged by these

19    plaintiffs, nor did they assert in discovery responses, that

20    counsel is quite correct that they have asked us questions

21    about hundreds of different subjects, whether they had anything

22    to do with the claims asserted or not.  And we have dealt with

23    those, usually able to work it out, either we object and they

24    don't follow up or we go to Judge Kurren and say, here we are

25    again and he helps us work it out.

1          THE COURT:  Yes, he's wonderful.

2          MR. GLYNN:  But when it comes to bees, this really

3    came from out in left field.  There was no fair notice, and it

4    would be entirely appropriate for the motion to be denied on

5    that ground alone.

6          Before I get into the conceptual failure of the

7    plaintiff's case, let me turn to the question you directed to

8    me.  And that is, well, you say you haven't used it since 2011

9    in the case of Sevin, what assurance can the court have that

10   you won't again.  And I understand that line of cases, and let

11   me, if I may, address it this way.

12         First, there's no evidence in this case presented by

13   the plaintiff, who has the burden as the moving party, that

14   there was a misuse of Sevin.  Sevin is the only chemical that

15   has this warning requirement and yet even Sevin is explicit,

16   you can apply it early in the morning or late in the afternoon.

17         So for whatever reason, it has the beekeeper warning

18   but acknowledges that you can apply it any day as long as you

19   apply it early or late.

20         THE COURT:  Well, I mean, a reasonable inference

21   though you have to read it together, you warn the beekeeper so

22   they can take active steps to keep the bees closer or whatever.

23         MR. GLYNN:  Au contraire.

24         THE COURT:  Okay.

25         MR. GLYNN:  And let me tell you why.  The beekeepers,

1  these are the so-called domesticated or hive bees, the great

2  majority of pollinators in our world are feral, they're wild

3  bees.  And so the protection that the label approved by the EPA

4  is not simply to protect the Arquettes of the world or the

5  Langlois of the world, it is predominantly to protect the most

6  active wild bee population.  But then let me address the other

7  party, I think we now have been told by this motion that

8  Plaintiffs Arquette and Langlois are beekeepers.  Counsel

9  seemed a little uncertain whether there may be others, but we

10  know about those two.

11      If we were to resume, contrary to the declaration of

12  Mr. Kopytowski, the use of Sevin, which we've not used in

13  nearly three years because other alternative products have been

14  developed, then we know where they are.  It would be very easy

15  for us now to notify them.  So that in the event we were to

16  resume use of this product and failed to give the required

17  warning, I think that would be a very sound predicate, unlike

18  the predicate before you, for a party to come in and seek

19  injunctive relief.

20      But I don't think given the facts of this case that it

21  would be appropriate for a federal district court to issue a

22  prophylactic injunction when there is no reasonable basis for

23  anticipating that such conduct would resume.  Because if we had

24  been a lawbreaker in the past and there was some reason to

25  believe that we might resume that activity for sure, but there

1   is no evidence that we were a lawbreaker.  In the reply -- I'm

2   getting older and dryer.

3        In the reply, there's many different things, as there

4   is in all their papers, but the idea that it was belittled,

5   that we said, well, wait a second, if you really were

6   concerned, why didn't you just let us know or why didn't you

7   register at the appropriate time, et cetera, because then we as

8   an applicator have the ability to identify, ah, there is a

9   beekeeper there.  Then we have a target.

10        The Arquettes, as we showed, have been infrequent,

11   over the years, correspondents with Pioneer, e-mails

12   complaining, asking, whatever.  Not once did they say, by the

13   way, we have bees and we know that agricultural chemicals can

14   be harmful to bees.  If you look at the complaint, and I know

15   in another context you dealt with this in some detail, mostly

16   having to do with statute of limitations, the complaint is

17   replete with allegations that since at least 2000 these

18   plaintiffs have been concerned about dangerous chemicals being

19   used by Pioneer and not just -- and that they could drift into

20   their community, et cetera.

21        Well, it's a very small step to say, well, if they

22   could be dangerous to humans, they might be toxic to insects

23   called bees, and therefore, we send Pioneer a note to say, hey,

24   by the way, just want you to be aware of this additional

25   concern that we have.  That was never done.

1          Unless the court has further questions on the question

2     you directed to me, I'd like to just go to a few other points.

3          THE COURT:  Yes, please.

4          MR. GLYNN:  Thank you, Your Honor.  An injunction as

5     the court knows is an emergency measure, provisional relief.

6          The party seeking that relief must come to the court

7     and carry a burden of proof and say to the court we have an

8     urgent situation, one that cannot await trial, and we need the

9     court to exercise its extraordinary powers to intervene.

10         The defense has no burden unless and until the

11    plaintiff carries that initial burden.  This case is two and a

12    half years old.  It has been subject to massive amounts of

13    written discovery, tens and tens of thousands of records have

14    been requested.

15         The records which counsel suggests may be reason to

16    defer to, again, have never been requested, they've never been

17    requested.  And the reason is this development of a bee claim

18    was never part of the case.

19         And so it would be -- even Judge Kurren, who I think

20    we would all agree is a person who tries to strike compromises

21    that allows the case to proceed without deferring to one side

22    or the other, finally got to the point where he said enough

23    already on all this chemical discovery, et cetera, and he put

24    an end to it.

25         And that was in part because we had demonstrated to

1    him how the material being produced in this case was being
2    funneled to political activists who had nothing to do with this
3    case, and I think perhaps he'd had enough, Judge Kurren, at
4    that point.  The problem with the plaintiff's case from a
5    conceptual standpoint is that none of their proof begins to
6    satisfy their burden.  You heard Mr. Smith stand up and say in
7    my opinion this, in my opinion that, that's not the way it
8    works.  He may be a very fine lawyer but he's not an expert on
9    this information.  The idea, sometimes we have to, forgive the
10   reference, we have to get out of the weeds and look at 10,000
11   feet.
12        If this injunction, if their position were valid that
13   you can't apply chemicals of certain types whenever bees may be
14   around, which is kind of what they say, guess what, you shut
15   down all of this farming in Hawaii.  That would be the net
16   result of it.  Because as counsel points out and as is
17   undisputed, bees are around all the time in Hawaii.  Despite
18   the population in the world being under pressure and despite
19   mite and other pests now being here in the islands, they find a
20   way to get on a boat and get here.  It's an amazing thing.
21   Despite that, the -- I got to the boat and I lost my train of
22   thought.
23        THE COURT:  Yeah.
24        MR. GLYNN:  But let me go to the main point, all of
25   these labels express the same concept.  They use different

1   nomenclature, but they're all dealing with the same concept,

2   whether as in the case of Sevin, it's got specific temporal

3   references or in the case of other products it refers to

4   visiting, are visiting, it's talking about the known fact,

5   unrefuted in this record, that bees have patterns of behavior.

6          And all of us who have been stung, I doubt any of us

7   have been stung at night, and there's a reason for that.  And

8   likewise there's a reason that bees -- boy, I really am drying

9   up -- tend to be active mostly in the morning, not the very

10  early morning but as the sun comes up.  And in the case of

11  corn, we've put in the evidence the pollen is shed from the

12  tassel for a very limited time and then it starts to desiccate.

13  It drys up in the sun.

14         So the active time is really the morning time, exactly

15  the time that they sprayed in the Anderson case, I think it was

16  the nine to noontime for some reason.  And so all of these

17  labels expressed the same concept, whether they use a time of

18  day reference or rather they describe a bee behavior

19  characteristic.

20         Now, you don't have to take my word for it because I'm

21  not an expert either, but we put in expert testimony from some

22  very qualified individuals, the head of the department at UH, a

23  fellow who worked for the Environmental Protection Agency,

24  among other federal agencies, who is responsible for label

25  language.

1           What have the plaintiffs put in?  Absolutely zero.

2    You have four declarations, this is the party with the burden

3    of proof.  You have the two plaintiffs who obviously have no

4    scientific training, but a lot of passion.  And they put in

5    there well, as far as I'm concerned, it looks to me like there

6    are fewer bees and I think it must be Pioneer.

7           I think global warming must be Pioneer as far as

8    they're concerned.  Everything must be Pioneer.  But that's not

9    proof.  Nor is there anecdotal observation that since 2007, it

10   seems there are fewer bees.  And as we pointed out, we've been

11   farming there since 2000 or before.

12          So why 2007, ah, if you look at the Hawaii

13   legislature, the Hawaii legislature starts to become involved

14   and become concerned because Hawaii's starting to see what

15   other parts of the world has seen about the collapse of bee

16   populations worldwide.  And the Hawaii legislature didn't say,

17   and we think this is because of chemicals, they identified the

18   known causes that have caused this worldwide concern.

19          So the idea that plaintiffs have even begun to show

20   that there has been a label violation by Pioneer is simply an

21   unsupported idea.  There's no expert that has said that.  If

22   you look at the two expert declarations they put in, what you

23   have are very generalized statements that are contradicted by

24   the very records that the plaintiffs themselves put in.  They

25   say oh, they claim at all times of the day legitimately, that's

1    kind of the gist.

2            And the reason that it was helpful that the plaintiffs

3    created Exhibit 8, which I think is a very good way to present

4    it to Your Honor, this is the exhibit that summarizes the

5    applications on one particular field, through the life --

6            THE COURT:  Right.

7            MR. GLYNN:  -- of that field.  And when you look at

8    that and they say, well, we highlight in yellow all of the

9    bee-toxic chemicals, the reason that is useful and more

10   manageable than just dealing with massive amounts of records is

11   it gives both sides and the court an illustration where we can

12   look specifically.

13           And what I looked at when I went through there is I

14   wanted to see, all right, are our data consistent with what

15   we're being told about how we farm out there?  And so you have

16   a, regardless, everybody knows that when you plant a corn

17   plant, I hope everybody knows, you don't have pollen there for

18   a number of weeks, get a little seedling, then it grows taller,

19   at some point a little tassel starts to form.  And then at some

20   point, the tassel, which is the male part of the plant becomes

21   sexually mature and will drop pollen for a very limited period

22   of time, and if it's not bagged, it'll drop it on to the

23   tassels of the embryonic corn that is then starting to form.

24           Amazing how every one of those silks seems to get

25   pollen on it because otherwise you get those skips that we

 1    illustrated in our photos.  But every single label has

 2    descriptors that talk about not applying when the bees tend to

 3    be active, not when they're in the neighborhood, not when

 4    they're around the corner.

 5         Not when they are coming tomorrow, but they don't want

 6    to douse the bees with product.  That's very bad.  And in

 7    the -- again, if we look at the Bennett and Anderson cases, if

 8    you look at Bennett, there was some of this argument that

 9    counsel has kind of referred to here about residue.  And,

10    again, if you take his argument you can't put it on because

11    there's going to be residue, you just can't use it during

12    perhaps some of the most critical crop protection phases of a

13    plant's life.

14         But if you look in Bennett, the court said that there

15    was no liability for residue, that the label, which in that

16    case was a product called Lannate, also an insecticide, just

17    like we're talking about here, and in that case the court said

18    no liability for residue, the labels intended to limit damages

19    from the quick kill component of Lannate.

20         In other words, the dousing, don't spray when the bees

21    are actively visiting the field, when the bees are foraging in

22    the field, when the bees are, present tense, visiting the field

23    or in the case of Sevin, don't apply when the, unless it's

24    early in the morning, two hours before this or later in the

25    evening, two hours after that.

1          So if we looked back at Exhibit 8, you can see how an

2     advocate will try to build a narrative, nonstop pesticides, all

3     the time these people say bees are around, ergo you're

4     violating the label.

5          But if you look at it, you'll see a bunch of those

6     applications have nothing to do with the time in the plant's

7     life cycle when bees are going to be present because there's no

8     pollen.  They're only interested in that corn plant potentially

9     once the plant's sexually mature and it sheds pollen, assuming

10    it hasn't been bagged, which is completely ignored even in the

11    reply, the bagging practice at that farm.

12         And then after a certain point, chemical applications

13    become irrelevant to bees because, again, the food source is

14    gone, bees are no longer interested.  And in the case of

15    herbicides, those don't have anything to do with it either

16    because they're applied to the ground.  This is not something

17    that is going to be a bee-ingested material.

18         So -- and I know I'm speaking at perhaps too great a

19    length, but I wanted to make sure that it was clear to you, and

20    I know it is, that the plaintiffs have not submitted any

21    evidence, expert or otherwise, to justify counsel's opinion

22    about what these labels mean.

23         We, in contrast, have put in first rate and detailed

24    evidence.  In the reply counsel says, well, it's all --

25    everything that we say is based on the declaration of one

1   alleged expert.  I saw that word and I said, which one is the

2   alleged expert?  The two experts in there are pretty qualified

3   and their qualifications are before the court.  And it

4   ill-behooves a party who has not bothered to assume his burden

5   of proof and give the court something substantive to then use a

6   pejorative and nothing else to describe the evidence of an

7   adversary.

8          The last thing I would say, Your Honor, two last

9   things, I guess, two other elements of proof, counsel conceded

10  here this morning, as he must, that they've done nothing to

11  show causation or to cause damage.  The assumption is if

12  something bad happened at our hives, it must be Pioneer.  That

13  doesn't work.  That doesn't work in courtrooms, really doesn't

14  work in casual conversation, unless you're talking about

15  somebody that nods at everything you say, that's not what a

16  courtroom is.  A courtroom is a place of proof.

17         As to the summary judgment, and by the way, we have

18  objected, we filed objections to the improper evidence that was

19  submitted with the motion, and that would apply both to the

20  preliminary injunction and to the motion for summary judgment.

21  Young lawyers sometimes, you know, wonder about the difference

22  between a declaration and a witness on the witness stand, and I

23  always tell them, it's the same thing.  If a witness were to

24  get on the stand and say what's in that declaration, would

25  Judge Kobayashi permit it, or would it be in -- or lack the

1    foundation.

2         So the objections we've made are made for a purpose,

3    and that is to highlight the absolute absence of evidence that

4    is proper and admissible that has been submitted by the party

5    with the burden of proof.  On the Sevin and the summary

6    judgment that, again, is a little bit of a kind of a gotcha

7    which really doesn't work.  It is important, it is material

8    that the plaintiffs did not ever, even in discovery responses

9    to us, bother to advise Pioneer, hey, by the way, I'm a

10   beekeeper.  This motion was their notification.

11        The idea that we can broadcast to the community

12   postcards, by the way, in case any of you are beekeepers out

13   there, we want you to know that a week from Tuesday, we're

14   going to apply Sevin, that's pretty farfetched.  It really is

15   pretty farfetched.  As I said, however, in response to your

16   question to me, in the event we were ever to return to using

17   Sevin again in the future, I think we know where Mr. Langlois

18   and Mr. Arquette are and we now know that they're beekeepers,

19   but there's no obligation beyond that.  And this is the last

20   point I'll make unless one of my colleagues yanks at my sleeve

21   and says wait a second, dummy, you forgot that one.  We

22   mentioned the Federal Insecticide, Rodenticide and Fungicide

23   Act affectionally known as FIFRA, and rodenticide, and FIFRA is

24   important to that argument.

25        The -- as Mr. Tinsworth in particular -- Dr. Tinsworth

1    in his declaration explains, how the EPA goes about determining

2    what should be on a label and what shouldn't be is a matter of

3    considerable intricacy and complexity.  But what the, the label

4    determines what warnings must be given.  So in the case of

5    Sevin, there is that affirmative requirement.  The fact that

6    EPA has chosen not to put that affirmative requirement on other

7    product labels is not trivial or insignificant.  It represents

8    a regulatory judgment that it is not required and the essence

9    of FIFRA preemption law, even though the old law got narrowed

10   in a case several years ago, but the essence of federal

11   preemption laws, neither local regulators or courts who

12   regulate through juries may impose additional labeling

13   requirements to those imposed by the federal government.

14        And there's many good reasons for that, they're beyond

15   the scope of what I should argue to you right now, but I would

16   just simply close by saying the idea that Pioneer has admitted

17   violations with respect to Sevin is preposterous.  If

18   Mr. Arquette or Mr. Langlois wanted us to know that they were

19   beekeepers, then I think we'd have a very different situation,

20   had we, despite that knowledge, applied without notifying them.

21        THE COURT:  Or if there was a registry --

22        MR. GLYNN:  Absolutely.

23        THE COURT:  -- containing their names.

24        MR. GLYNN:  There are ways to make your concerns

25   known.  And as in the two out-of-state cases cited by

1    plaintiffs, both sides, the commercial applicators were very

2    active in letting the nearby farmer know or the nearby tree

3    protector know that we're here, so beware please, we want to be

4    protected.

5           With that, unless the court has questions, Your Honor,

6    I'll stop flapping my gums and take a seat.

7           THE COURT:  All right.  Thank you.  Mr. Smith, I'll

8    give you five minutes.

9           MR. SMITH:  Sure, just briefly.  So just a couple of

10   things, if this was a hearing and they brought Mr. Kopytowski

11   and they put him on the stand and they asked the question,

12   Mr. Kopytowski, what were the practices, when's the

13   pollination, and he told Your Honor, well, Your Honor, out of

14   court, I reviewed some records and this is what they said, I

15   promise you that, I would have every right to object to that at

16   trial.  Particularly, if he's not personally involved in making

17   the application, keeping the records, all these different

18   things.

19          THE COURT:  Well, I mean, if they're kept in the

20   ordinary course and he reviewed them, he can testify.

21          MR. SMITH:  Sure he could.  So if they're kept in the

22   ordinary course, where are they?  These records that supposedly

23   exonerate precisely on this record.

24          THE COURT:  I presume they're at their business.  They

25   said you never requested them.  But whatever with regard to

1    that, so what's your point?

2          MR. SMITH:  I guess the point is this argument of what

3    we requested or didn't request.  I could represent to you that

4    I did.  They can obviously represent that we didn't.

5          THE COURT:  Okay.

6          MR. SMITH:  It doesn't go anywhere.  The point is that

7    on, for example field 160, pollination allegedly ended at 60

8    and if there was something there actually tangible that showed

9    when this pollination occurred that should be part of this, so

10   we can look at it, that would be a simple thing to do.

11         As far as the FIFRA and being another young lawyer and

12   having these great experts, yeah, the point of FIFRA is to

13   prevent and prohibit someone from changing the labels, which is

14   what their experts are trying to do.  What they want Your Honor

15   to say is take a look at all these different labels that have

16   different warnings and condense it down to what it really means

17   is you just don't spray on active bees, that's precisely what

18   FIFRA tells you not to do, tells people not to do.

19         The labels are specific.  Those differences in

20   language have meaning, and this assertion that we never, we

21   being Pioneer, never checked for bees and that's okay because

22   we always spray in the evening which is sort of the assumption,

23   the reason that Asana exhibit, which is exhibit -- that's

24   Exhibit 11, Your Honor, if you go through that one single page,

25   you'll quickly see this idea that they were strict applications

1   and I only used one.  You can look at either of the large

2   exhibits with pesticide applications are certainly not limited

3   to the evening hours, that's not the case.

4        They're sprayed throughout the day, and we've heard

5   already the acknowledgment that bees are there year round.  If

6   bees are there year round and their position is, well, what the

7   labels really mean, not what they say, but what they mean we

8   ought to be spraying in the evening, all these applications

9   should be in the evening, but they're certainly not.  So just

10  to respond to that.

11       Your Honor, I -- unless you have any further

12  questions, I very much appreciate your time.

13       THE COURT:  All right.  Thank you very much.  Thank

14  you both for your excellent oral argument.  I consider the

15  matter submitted, and I'll issue a written order, or if not the

16  reasoned order certainly an outline of my decision by the end

17  of the month.  Thank you very much.  Good day.

18   (The proceedings concluded at 11:35 a.m., June 23, 2014.)

19

20

21

22

23

24

25

```
 1              COURT REPORTER'S CERTIFICATE

 2

 3         I, CYNTHIA R. OTT, Official Court Reporter, United

 4    States District Court, District of Hawaii, Honolulu, Hawaii, do

 5    hereby certify that pursuant to 28 U.S.C. §753 the foregoing is

 6    a true, complete and correct transcript of the stenographically

 7    reported proceedings had in connection with the above-entitled

 8    matter and that the transcript page format is in conformance

 9    with the regulations of the Judicial Conference of the United

10    States.

11
           DATED at Honolulu, Hawaii, June 27, 2014.
12

13

14                    _____/s/ CYNTHIA R. OTT_____
                      CYNTHIA R. OTT, RMR, CRR
15

16

17

18

19

20

21

22

23

24

25
```